**RIVER TERMINALS CORP.**

v.

**UNITED STATES.**

**STANDARD OIL CO. OF N. J.**

v.

**THE ALMA D et al.**

**STANDARD OIL CO. OF N. J.**

v.

**UNITED STATES.**

Nos. 845, 848, 914 Admiralty.

United States District Court,
E. D. Louisiana, New Orleans Division.

April 7, 1954.

Lemle & Kelleher, Selim Lemle, Terriberry, Young, Rault & Carroll and Banjamin W. Yancey, New Orleans, La., for libellants.

Lemle & Kelleher, Joseph V. Ferguson, Lansing L. Mitchell, New Orleans, La., for respondents.

CHRISTENBERRY, Chief Judge.

On the night of February 23, 1944, shortly after 11 p. m., a collision occurred in Mobile Bay between the Steamship Benjamin R. Curtis, owned and operated by the United States of America, and the tow of the Tug Alma D, owned and operated by River Terminals Corporation. The Tug Alma D had in tow three loaded oil barges, RTC–120, RTC–112 and RTC–111, in that order. The S.S. Benjamin R. Curtis struck the lead barge in the Alma D's tow, RTC–120, and did damage to it, after which the tow swung around under the ship's counter and the RTC–111 struck the ship's propeller and also sustained damage. Standard Oil Company of New Jersey was the owner of the oil cargo aboard the three barges, some of which cargo aboard the RTC–120 and RTC–111 was lost and/or damaged.

As a result of this collision three libels were filed. No. 845 was filed by River Terminals Corporation against the United States of America to recover its own damages. This libel was filed under the Suits in Admiralty Act (Merchant Vessels) approved March 9, 1920, 46 U.S.C.A. 741 et seq., and was brought under the principles of libels *in rem* as well as *in personam*. The United States

filed a cross-libel for the damages sustained by the S.S. Benjamin R. Curtis.

No. 848 was a libel filed by Standard Oil Company of New Jersey against the Tug Alma D and her barges, and their owner, River Terminals Corporation, and also against the United States of America to recover the loss of and damage to cargo. As to the United States, this libel also proceeded under the Suits in Admiralty Act, supra, under the principles of libels *in rem* and *in personam*. River Terminals Corporation then impleaded the United States of America under the 56th Admiralty Rule, 28 U.S.C.A.

No. 914 was originally filed by the Standard Oil Company of New Jersey against the United States of America in the District Court of the United States, for the Eastern District of Pennsylvania. It was filed for jurisdictional purposes and in substance duplicated the libel filed by Standard Oil Company of New Jersey in No. 848 in Admiralty of this Court. This proceeding was transferred from the Eastern District of Pennsylvania to the Eastern District of Louisiana, where it took docket No. 914 in Admiralty. The United States then filed a petition under the 56th Admiralty Rule to implead the Alma D and her barges and River Terminals Corporation, their owner.

On joint motion of all parties and on order of the Court, the three libels were consolidated for all purposes, with one decree to be entered which will adjudicate the rights which the various parties may have against each other and assess any damages that one or more of them are entitled to recover against any of the others. Thus consolidated, these causes came on for trial.

The Court, having heard the proof and the law, and having taken time to consider, now makes the following:

### Findings of Fact

1. Standard Oil Company of New Jersey was at all material times and now is a corporation organized under the laws of the State of Delaware, having its principal place of business in the United States at New York City. On January 28, 1948 the name and style of the libellant corporation was changed to Esso Standard Oil Company, there being no change in the corporate status and no change other than that of the style or name; and wherever the name of Standard Oil Company of New Jersey appears in the pleadings or herein, it shall be deemed to be and read as Esso Standard Oil Company.

2. River Terminals Corporation was at all times material hereto a corporation organized under the laws of the State of Delaware, with its principal place of business at New Orleans, Louisiana.

At all times material hereto, River Terminals Corporation was owner and operator of the motor tug Alma D, and of the barges known as the RTC-111, RTC-112 and RTC-120, being steel oil barges.

3. At all times material hereto, the United States of America was and now is a corporation sovereign, and owner and operator of the Steamship Benjamin R. Curtis, which was being operated by the United States as a merchant vessel.

The Steamship Benjamin R. Curtis was within and subject to the jurisdiction of the United States District Court for the Eastern District of Pennsylvania when the libel in #914 was filed in that district. The libels in #848 and #914 were properly filed and the suits brought within the time provided for in the Suits in Admiralty Act (Merchant Vessels), 46 U.S.C.A. 741 et seq.

4. On February 17, 1944, Standard Oil Company of New Jersey shipped and placed aboard the barges RTC-111, RTC-112 and RTC-120 at Atreco, Texas a certain quantity of gasoline to be carried by said barges in tow of the Tug Alma D from Atreco, Texas, to Carrabelle, Florida.

The gasoline was to be carried by the barges in tow of the Tug Alma D under a contract then in force between Standard Oil Company of New Jersey and River Terminals Corporation, the perti-

nent provisions of which contract are as follows:

"Insurance: Towers' liability and hull insurance shall be carried with first class underwriter by Owner for Owner's account.

\* \* \* \* \* \*

"Force Majeure: The tow, its captain and Owner shall not, unless otherwise in this charter expressly provided, be responsible for any loss or damage arising or resulting from: any act, neglect, default or barratry of the captain, pilots, mariners or other servants of the Owner in the navigation or management of the vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding, or peril, danger or accident of navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the charterer; Owner, Shipper or Consignee of the cargo, their agents or representatives; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the tow unless caused by want of due diligence on the part of the Owner to make the tow seaworthy or to have it properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the tow, its captain or Owner, nor the Charterer, shall, unless otherwise in this charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder arising or resulting from:—act of God, act of war; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people, or seizure under legal process provided bond is promptly furnished to release the tow or cargo; strike or lockout, or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion."

5. About 11:00 p. m., February 19, 1944, the Alma D with the three barges being towed astern on a hawser and bridle, and with the Standard Oil cargo aboard, was crossing Mobile Bay, Alabama, from Pass Aux Herons on the west toward Bon Secour Light on the east, and traveling on a substantially easterly course. The Benjamin R. Curtis, light, was inbound to Mobile, proceeding up Mobile Channel on a substantially northerly course. The courses of the two were thus intersecting at virtually a right angle.

Each of the three barges was 195 feet long, 35 feet in width, and 10 feet in depth, and were being towed astern of the tug on a 150 foot hawser and 50 foot bridle, so that the total length of the tow was about 800 feet.

6. The night was slightly hazy but there was excellent visibility. Lights could be seen at a distance of 5 to 7 miles.

All vessels carried proper lights.

7. The Benjamin R. Curtis was a large ocean-going, steel, steam Liberty type vessel of 7176 gross tons. At the time involved, she had no cargo, and her deepest draft was 15 feet or less. Prior to the collision, she was proceeding up Mobile Channel at a speed of 11 or 12 knots, or a speed of better than 1100 to 1200 feet a minute.

The Alma D and her tow was making a speed of 4 to 5 miles per hour.

8. At the point of the collision, Mobile Channel runs practically north and south. The Alma D and her tow, on an easterly course, was entering or just about to enter the dredged ship channel at right angles at a point just south of Beacon 8, when she received a one-blast whistle signal from the Benjamin R. Curtis. This one blast whistle signal from the Curtis, which was approaching the course of the Alma D and her tow at right angles from the starboard, indi-

cated that the ship intended to hold her course and speed.

At this time, with the Benjamin R. Curtis bearing down upon her at right angles from the starboard and at a great rate of speed, the ship was already too close for the Alma D to comply with the starboard hand crossing rule and to keep out of the way of the Benjamin R. Curtis, or to avoid crossing ahead, or to slacken her speed, or stop, or reverse. The Alma D was too close to stop her tow, and she could not turn aside for fear that the towing hawser might become entangled in the tug's wheel or the barges ride up over the tug. Thus, those on the Alma D felt that they had no alternative in the extremity except to speed up and to attempt to cross the course of the ship.

The one-blast signal from the ship was accordingly promptly answered by the tug with a four-blast danger signal. The Curtis replied with a four-blast signal.

At the time that the Benjamin R. Curtis sounded the one-blast signal she was already within one-half to one-quarter mile of the Alma D.

Immediately upon sounding the danger signal, and in order to avoid the tug's being run down by the ship, with virtually certain disaster and loss of life, the Alma D threw off her towing hawser and went full ahead in the hope of permitting the ship to pass between her and the barges.

At the last moment, the ship altered her course to port and almost immediately collided bow on with the starboard side of the lead barge in the Alma D's tow, RTC–120, nearly amidships, damaging that barge and causing loss and damage to gasoline belonging to Standard Oil Company of New Jersey on the said barge. The tow, under the impact, then swung around and fell alongside the port side of the Benjamin R. Curtis, with the result that the last barge in the tow, RTC–111, was struck by the propeller of the Benjamin R. Curtis, damaging the barge and causing loss and damage to gasoline belonging to Standard Oil Company of New Jersey on the said barge.

9. The evidence establishes that certainly not over three minutes, and most probably not over two minutes, elapsed between the sounding of the one-blast signal by the Benjamin R. Curtis and the actual impact of collision.

10. Since the lights of both vessels could have been seen at a distance of 5 to 7 miles, these two vessels could and should have seen each other and kept each other under observation for 30 to 40 minutes before the collision. Instead, the Alma D did not see the Benjamin R. Curtis until the Curtis blew the one-blast signal. The Benjamin R. Curtis did not see the Alma D and her tow timely and even after seeing them waited two minutes before blowing the one-blast signal. At that time, the vessels were in such close proximity that probably the suggested passing could not be safely effected.

Both vessels are at fault for having approached within such close proximity ignorant of each other's presence.

11. The Alma D had no one posted, as lookout, with the exclusive and specific duty of watching for lights. At the time, there were in her wheelhouse her relief pilot, who was at the wheel, a deckhand who was on watch, and the tug's master, who was then off watch, but none had the exclusive and specific duty of lookout. The excuse advanced by the Alma D for not having sighted the Benjamin R. Curtis earlier was that the ship's lights were lost against the background of the lights of Fort Morgan, situated at the entrance to Mobile Bay and thus beyond the approaching ship. Notwithstanding this, a proper lookout on the Alma D, having the specific and exclusive duties of lookout, might have discovered the approaching Benjamin R. Curtis in time to avoid the Alma D's going virtually into the jaws of collision in ignorance of the danger.

12. The Benjamin R. Curtis had no lookout stationed forward, in the eyes of the ship. She had one seaman said to have been stationed as lookout not

forward but on the flying bridge. There is no evidence of precisely where on the flying bridge he was actually stationed at the crucial times. He was not produced during the early stages of the litigation, and by the time of the trial he was dead. He was not produced as a witness at the Coast Guard investigation, the record of which has been stipulated in evidence.

Had a lookout been placed at the forecastle head, at the forward end of the ship, he would there have had an unobstructed view of the horizon, an opportunity to sight low-lying objects, as well as being in a much better position to hear the signals of the other vessels.

The Benjamin R. Curtis was 7 or 8 feet lower by the stern than at the bow, a fact which constituted a material degree of obstruction of the view of those amidship on the flying bridge, especially as to low-lying objects such as tugs or barges and, in particular, the Alma D and her barges. In addition, forward of the flying bridge, there were numerous obstructions to the vision of the navigators and lookout, such as all the vessel's forward rigging, her booms, her foremast, and large gun turrets, and which in fact obstructed such vision.

At some time during the sequence of events, and just before collision, the seaman assigned to lookout on the flying bridge was sent down from the flying bridge to call the master who had left the flying bridge and gone below. Therefore, the said lookout was, at material times, in fact not performing his duty as lookout.

The Alma D immediately answered the one-blast signal of the Steamship Benjamin R. Curtis by a four-blast danger signal which the Steamship Benjamin R. Curtis claims it did not hear. Failure to hear the tug's danger signal establishes the inadequacy of the lookout being kept aboard the Benjamin R. Curtis.

The master and pilot of the Benjamin R. Curtis both admitted that during the navigation of Mobile Ship Channel on that night, there were numerous lights visible ahead of the ship, to which they paid no particular attention. This admitted disregard of such lights, in such frequented and well-used waterways as Mobile Bay, further establishes the inadequacy of the watch being kept aboard the ship.

13. The Benjamin R. Curtis had no person standing by the anchors in a position to let them go promptly in case of emergency. Therefore, although immediate danger of collision was apparent no later than the time that the Alma D blew her danger signal, and probably much earlier, the Benjamin R. Curtis could not and did not drop her anchors. Her failure to drop them constitutes fault directly contributing to the collision.

14. The Benjamin R. Curtis failed to stop and reverse when she blew the danger signal, although the immediate danger of collision was then plain.

15. The version of the accident as given in the testimony of the witnesses of the Benjamin R. Curtis in this litigation varied in many important particulars from the contemporaneous record as shown in their logs, bell books, etc., and in their testimony before the Coast Guard. The Court finds that their contemporaneous record and their testimony before the Coast Guard is probably more consistent with the actual occurrences, on those points where it differs from their oral testimony at later dates. In the testimony before the Court there was a disposition on the part of the ship's witnesses to lengthen the time between the one-blast signal and the collision, and to lengthen the distance between the craft when the ship first saw the tug. However, even on this version, the Curtis kept on much too long in face of her hearing no response to her one-blast signal and until collision was absolutely inevitable. The Alma D and her tow were in full view, the bearings not changing, and the tug and her tow were obviously moving into the course of the

ship. The ship's one-blast signal, according to this version, was apparently ignored. Nevertheless, the ship continued at full speed ahead for at least two full minutes. Then, what was done was not an immediate reversal of the engines and dropping of anchors to bring the ship as quickly as possible to a dead stop in the water; instead, she merely stopped her engines which, with her great momentum, allowed her to be carried forward with slowly diminishing speed.

By this same version, she finally went full astern and hard left almost at the moment of impact. There was no reason or excuse why she failed to take this maneuver earlier; in fact, had she taken it earlier, the collision would have been avoided.

16. Both the Alma D and the Benjamin R. Curtis are guilty of faults directly causing and contributing to the collision.

As a result of those faults and of the collision, certain of the said gasoline then and there belonging to the Standard Oil Company of New Jersey was lost and damaged, and Standard Oil Company of New Jersey sustained monetary damages as a result of the said loss and damage to the gasoline; River Terminals Corporation has suffered damages with respect to the barges RTC–120 and RTC–111; and the United States of America has suffered damages with respect to the Benjamin R. Curtis.

## Conclusions of Law

1. The subject matter of this litigation, a marine collision, is within the admiralty and maritime jurisdiction of the Court, 28 U.S.C. § 1333; and, as to the United States of America, is within the jurisdiction of the Court under the Suits in Admiralty Act (Merchant Vessels), 46 U.S.C.A. § 741 et seq., and the libels of Standard Oil Company of New Jersey and River Terminals Corporation were filed and the suits brought in time and in conformity with said Act.

2. Navigation of the waters wherein this collision occurred is governed by the "Inland Rules", 33 U.S.C.A. § 171 et seq.

3. The Benjamin R. Curtis was at fault contributing to the collision for her failure to keep a proper lookout and to discover the approach of the Alma D and her tow in time.

She was also at fault contributing to the collision for failing to have her lookout properly placed. A lookout should have been in the extreme forward end of the ship, where he would have had a clear, unobstructed view ahead, and not on the flying bridge. In frequented waters, as here, the lookout should be placed as near as practicable to the surface of the water, and must be in a position to have clear, unobstructed view, see The Ottawa, 1866, 3 Wall. 268, 70 U.S. 268, 269, 18 L.Ed. 165; Griffin op. cit., pages 273, 274; G. B. Zigler Co. v. Barker Barge Line (The Whitecastle— The Leta) 5 Cir., 1948, 167 F.2d 676.

The fact that both the pilot and the master of the Benjamin R. Curtis had, for a considerable length of time before the collision, sighted lights in the Bay ahead (which lights included those of the Alma D and her tow, and which were visible) and had paid no particular attention to those lights, is a fault contributing to the collision.

At material times the seaman appointed to act as lookout was absent from his post; and this was a fault contributing to the collision.

4. The delay of the Benjamin R. Curtis for at least two minutes, on its own story, in signalling the Alma D after she had become aware of the presence of the tug and tow constitutes fault contributing to the collision. The Segundo, 2 Cir., 1940, 116 F.2d 492; Kieckhefer Container Co. v. The Minerva, D.C.E.D.Pa.1945, 58 F.Supp. 884, affirmed in a per curiam, The Gretchen (The Minerva), 3 Cir., 1946, 156 F.2d 61. If signals are to be of any value, they must be given with an allowance of a sufficient time to exchange signals

and agree on a passing, taking into consideration the speed, power and apparent agility of the vessels.

5. The failure of the Benjamin R. Curtis to go full speed astern in time, and to drop one or both of the anchors, and to turn to port out of the channel constitutes faults contributing to the collision. In waters well frequented by small tows, such as the waters in which this collision occurred, the law requires that a ship should have a competent person standing by in the forecastle ready at a moment's notice to let go the anchors, see The Virginia (The Doheny III), 2 Cir., 1928, 25 F.2d 623; The City of Peking, 14 App.Cases 40 (1880); The Sunnyside, 2 Cir., 1918, 251 F. 271, and The Wireless No. 1, D.C. 1923, 290 F. 239. The Curtis's admitted failure to have anyone on the forecastle prepared to drop the anchors in these waters was a fault contributing to the collision.

6. The Benjamin R. Curtis, as the starboard hand vessel in a crossing situation, was the "privileged" or "holding on" vessel, 33 U.S.C.A. §§ 204, 206. However, since the plain purpose of the Rules is to minimize the danger of collision, the so-called privileged vessel has no absolute right to keep a course and speed regardless of the danger involved in that action. Her right to maintain her privilege ends when there is danger of collision, and in the presence of that danger both vessels must be " 'stopped and backed if necessary, until signals for passing with safety are made and understood' ", Postal Steamship Corporation v. The El Isleo, 1940, 308 U.S. 378, 60 S.Ct. 332, 334, 84 L.Ed. 335. See also Sawyer v. McDonald, 5 Cir., 1948, 165 F.2d 426; G. B. Zigler Co. v. Barker Barge Line (The Whitecastle The Leta), 5 Cir., supra; The New York, 1898, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126.

On its own story, therefore, the Benjamin R. Curtis is at fault contributing to the collision in that she failed to see the Alma D and her tow timely, and after seeing them delayed blowing a passing signal for two minutes, then signaled for a passing when the vessels were in too close proximity for the passing to be effected with safety, and having failed to hear the danger signal which was promptly blown by the Alma D, thus apparently getting no response from the tug to her own one-blast signal, seeing that the Alma D was giving positive evidence of an apparent intention to depart from her duty by proceeding straight on her own course toward and across the course of the Curtis, notwithstanding, did not reduce headway, nor stop and reverse, nor do anything until it was obviously too late for any good.

7. The Alma D was also guilty of fault contributing to the collision for failure to keep a proper lookout, for failure to discover the approach of the Benjamin R. Curtis in time, and for having gotten herself, because of her failure to discover the Curtis in time, into a position where she was unable to perform her clear duty under the Inland Rules to keep out of the way of the Curtis, to avoid crossing ahead of her, and if necessary to slacken her speed or stop or reverse; Farwell's Rules of the Nautical Road, U. S. Naval Institute, 1941, pages 249, 255; Griffin, The American Law of Collision (1949) Chapter VII, Pages 262 et seq; The Vedamore, 4 Cir., 1905, 137 F. 844; The Manchioneal, 2 Cir., 1917, 243 F. 801; U.S.C. Title 33, §§ 204, 207, 208.

8. The contract between Standard Oil Company of New Jersey and River Terminals Corporation was a contract for the private carriage of petroleum products. Sacramento Navigation Co. v. Salz, 1926, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663; Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89; Texas Co. v. Lea River Lines, 3 Cir., 1953, 206 F.2d 55.

The "force majeure" section of that contract which released River

**106**

Terminals Corporation and the Alma D from liability for errors of navigation is valid as to Standard Oil Company of New Jersey. Texas Co. v. Lea River Lines, supra. Nevertheless, Standard Oil Company of New Jersey, as cargo owner, is entitled to recover all of its damages from the one joint tort feasor, the United States of America as owner of the Benjamin R. Curtis, leaving the United States to recoup from the Alma D and her owner the contribution of the latter as the other joint tort feasor. The fact that the Alma D and the River Terminals Corporation has a contractual defense against a direct claim by cargo does not lessen the full liability of the United States and the Benjamin R. Curtis to the innocent cargo, nor prevent the United States of America from recouping from the Alma. D and River Terminals Corporation the latter's share of what the United States must pay to the cargo, see The Chattahoochee, 1899, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801; United States v. Atlantic Mutual Insurance Co., 1952, 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907.

9. Accordingly, Standard Oil Company of New Jersey, now named Esso Standard Oil Company, is entitled to its damages from the United States of America, and the United States of America is entitled to recoup and recover over from the Alma D and River Terminals Corporation one-half of whatever sums it must pay to Standard Oil Company of New Jersey, now named Esso Standard Oil Company.

The damages sustained by River Terminals Corporation as a result of the damage to its equipment; and the damages sustained by the United States of America as a result of the damage to the Benjamin R. Curtis should be divided equally by the Alma D and River Terminals Corporation on the one hand, and the United States of America on the other.

Let decree be entered accordingly.