## UNITED STATES *v.* ATLANTIC MUTUAL INSURANCE CO. ET AL.

No. 450.   Argued March 7, 1952.—Decided April 21, 1952.

*James L. Morrisson* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Baldridge, Samuel D. Slade, Roscoe H. Hupper* and *Ray Rood Allen.*

*Leonard J. Matteson* argued the cause for the Farr Sugar Corporation et al., respondents. With him on the brief were *Oscar R. Houston* and *Richard F. Shaw.*

*Cletus Keating, Edwin S. Murphy* and *Louis J. Gusmano* submitted on brief for the Belgian Overseas Transport, S. A., respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

Respondents are cargo owners [1] who shipped goods on the steamship *Nathaniel Bacon* owned by petitioner, the United States, and operated as a common carrier of goods for hire. It collided with the *Esso Belgium* and respondents' cargo was damaged. The ships were also damaged. This litigation was brought in the District Court to determine liability for the damages suffered by the cargo owners and for the physical damage caused the ships. It was agreed in the District Court that:

(a) The collision was due to negligent navigation by employees of both ships. The cargo owners were in no way at fault.

(b) The *Belgium,* as one of two joint tortfeasors, must pay "100%" of damages suffered by the *Bacon's* cargo owners.

---

[1] Certain insurance companies are parties to this suit as subrogees of their insured cargo owners. Some cargo owners were not insured.

238

(c) Because of § 3 of the Harter Act [2] and § 4 (2) of the Carriage of Goods by Sea Act,[3] the cargo owners are barred from directly suing the *Bacon* for cargo damages.

(d) Since the two ships were mutually at fault, the aggregate of all damages to both should be shared by both.[4]

(e) In computing the aggregate damages caused both ships, account should be taken of the cargo damages recovered from the *Belgium* by the cargo owners.

(f) The bill of lading issued by the *Bacon* to the cargo owners contained a "Both-to-Blame" clause.[5] This clause, if valid, requires the cargo owners to indemnify the carrier *Bacon* for any amounts the

[2] 27 Stat. 445, 46 U. S. C. § 192. This section provides that if due diligence is exercised by the shipowner in making the ship seaworthy and properly manned, equipped, and supplied, then "neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel . . . ."

[3] 49 Stat. 1210, 46 U. S. C. § 1304 (2). This section provides that "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship; . . . ."

[4] The shipowners have stipulated that in this case the *Esso Belgium* is to bear two-thirds and the *Nathaniel Bacon* one-third of the total damages, although the normal admiralty rule requires an equal division of damages. *Halcyon Lines* v. *Haenn Ship Corp.*, 342 U. S. 282, 284.

[5] The clause reads as follows:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim what-

*Bacon* loses because damages recovered by the cargo owners from the *Belgium* are included in the aggregate damages divided between the two ships.

The only question presented to us is whether the "Both-to-Blame" clause is valid. Respondent cargo owners contend that it is void and unenforceable as a violation of the long-standing rule of law which forbids common carriers from stipulating against the consequences of their own or their employees' negligence. Petitioner, the United States, contends that § 3 of the Harter Act, as substantially reenacted in § 4 (2) of the Carriage of Goods by Sea Act, provides special statutory authorization permitting ocean carriers to deviate from the general rule and to stipulate against their negligence as they did here. The District Court held the clause valid. 90 F. Supp. 836. The Court of Appeals reversed. 191 F. 2d 370. Deeming the question decided of sufficient importance to justify our review, this Court granted certiorari. 342 U. S. 913.

There is a general rule of law that common carriers cannot stipulate for immunity from their own or their agents' negligence. While this general rule was fashioned by the courts, it has been continuously accepted as a guide to common-carrier relationships for more than a century [6] and has acquired the force and precision of a legislative enactment. Considering the relationship of the rule to the Harter Act, this Court said in 1901 that "in view

---

soever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier."

[6] See, *e. g., Liverpool Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397, 438–444 (1889); *Knott* v. *Botany Mills,* 179 U. S. 69, 71 (1900); *Railroad Co.* v. *Lockwood,* 17 Wall. 357 (1873); *Boston & Maine R. Co.* v. *Piper,* 246 U. S. 439, 445 (1918); *San Giorgio I* v. *Rheinstrom Co.,* 294 U. S. 494, 496 (1935). And see cases collected in 9 Am. Jur. 874–877.

of the well-settled nature of the general rule at the time the statute was adopted, it must result that legislative approval was by clear implication given to the general rule as then existing in all cases where it was not changed." *The Kensington,* 183 U. S. 263, 268–269. Our question therefore is whether the language of the Harter Act, substantially reenacted in the Carriage of Goods by Sea Act, has carved out a special statutory exception to the general rule so as to permit a carrier to deprive its cargo owners of a part of the fruits of any judgment they obtain in a direct action against a noncarrying vessel that contributes to a collision.

Prior to the passage of the Harter Act in 1893, cargo damages incurred in a both-to-blame collision could be recovered in full from either ship. *The Atlas,* 93 U. S. 302. The Harter Act, under some circumstances, took away the right of the cargo owner to sue his own carrier for cargo damages caused by the negligent navigation of the carrier's servants or agents. It did not deprive the cargo owner of his tort action against the noncarrying ship. *The Chattahoochee,* 173 U. S. 540, 549–550. Nor did the Harter Act go so far as to insulate the carrier from responsibility to another vessel for physical damages caused to the ship by negligent navigation of the carrier's servants or agents. In *The Delaware,* 161 U. S. 459, 471, 474, this Court declined to give the Harter Act such a broad interpretation even though the language itself, if "broadly construed" and considered alone, would have justified such an interpretation. In addition, the Harter Act does not exonerate the carrier from its obligation to share with the noncarrier one-half the damages paid by the noncarrier to the cargo owners. *The Chattahoochee, supra,* at pp. 551–552; see also *Aktslsk. Cuzco* v. *The Sucarseco,* 294 U. S. 394, 401–402.

Apparently it was not until about forty years after the passage of the Harter Act that shipowners first attempted

by stipulation to deprive cargo owners of a part of their recovery against noncarrying ships. See *The W. W. Bruce,* 14 F. Supp. 894, rev'd on other grounds, 94 F. 2d 834. The present effort of shipowners appears to date from 1937 when the North Atlantic Freight Conference adopted the "Both-to-Blame" clause.[7] So far as appears, this is the first test of the legality of the clause that has appeared in the courts. When Congress passed the Carriage of Goods by Sea Act in 1936, it indicated no purpose to bring about a change in the long-existing relationships and obligations between carriers and shippers which would be relevant to the validity of the "Both-to-Blame" clause. At that time all interested groups such as cargo owners, shipowners, and the representatives of interested insurance companies were before the congressional committees.[8] Although petitioner and respondents both appear to find comfort in the language and the hearings of the 1936 Act, nothing in either persuades us that Congress intended to alter the Harter Act in any respect material to this controversy.

Petitioner argues that the clause does nothing more than remove an "anomaly" which arises from this Court's construction of the Harter Act. It is said to be "anomalous" to hold a carrier not liable at all if it alone is guilty of negligent navigation but at the same time to hold it indirectly liable for one-half the cargo damages if another ship is jointly negligent with it. Assuming for the moment that all rules of law must be symmetrical, we think it would be "anomalous" to hold that a cargo owner, who has an unquestioned right under the law to recover full damages from a noncarrying vessel, can be compelled to

---

[7] Robinson, Admiralty, 872, 873; Knauth, Ocean Bills of Lading (3d ed. 1947), 95, 136, 175.

[8] Hearings before Senate Committee on Commerce on S. 1152, 74th Cong., 1st Sess.

give up a portion of that recovery to his carrier because of a stipulation exacted in a bill of lading. Moreover, there is no indication that either the Harter Act or the Carriage of Goods by Sea Act was designed to alter the long-established rule that the full burden of the losses sustained by both ships in a both-to-blame collision is to be shared equally. Yet the very purpose of exacting this bill of lading stipulation is to enable one ship to escape its equal share of such losses by shifting a part of its burden to its cargo owners.

Here, once more, "we think that legislative consideration and action can best bring about a fair accommodation of the diverse but related interests"[9] of the varied groups who would be affected by permitting carriers to deviate from the controlling rule that without congressional authority they cannot stipulate against their own negligence or that of their agents or servants. If that rule is to be changed, the Congress, not the shipowners, should change it.[10]

*Affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON joins, dissenting.

Only a few weeks ago this Court reversed a unanimous opinion of the Court of Appeals for the Fourth Circuit which had held opposed to public policy, agreements whereby retailers of eyeglasses turned over a portion of

---

[9] *Halcyon Lines* v. *Haenn Ship Corp.*, 342 U. S. 282, 286.

[10] We have not overlooked the argument that this bill of lading stipulation should be upheld because of this Court's holding and opinion in *The Jason*, 225 U. S. 32. The *Jason* case upheld a stipulation that both shipowner and cargo owner should contribute in general average on account of sacrifices and expenses necessarily incurred by the master of the ship in order to preserve the cargo as a whole. Moreover, this general average clause "was sustained because it admitted the shipowner to share in general average only in circum-

the purchase price to the oculist who referred the customer to them. In so doing, "we voice[d] no approval of the business ethics or public policy involved" in the agreements. *Lilly* v. *Commissioner,* 343 U. S. 90, 97. This refusal to make our private views of right into the legal standards for the activities of men of affairs has increasingly characterized our decisions in the vague and shifting area of agreements challenged as unenforceable because offensive to what must be deemed to be legally controlling policy. "In the absence of a plain indication of that [dominant public] policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, this Court should not assume to declare contracts of the War Department contrary to public policy." *Muschany* v. *United States,* 324 U. S. 49, 66–67. No more unrestrained justification warrants courts to strike down private business agreements. Judged by such a standard, the agreements before us should be enforced.

Before 1893, when the Harter Act [1] was passed, the obligations of seagoing carriers with respect to passengers and cargo were defined by this Court in the exercise of its admiralty and maritime jurisdiction from case to case. Toward cargo the ocean carrier stood in the relation of an insurer, liable for any damage save that caused by act of God; and to passengers it owed the duty of highest care. Only by holding carriers to this mark was it thought that

stances where by the Harter Act he was relieved from responsibility." *Aktslsk. Cuzco* v. *The Sucarseco,* 294 U. S. 394, 403. Here the shipowner attempted to relieve itself from responsibility for negligence of its employees in connection with damages inflicted on another ship—"circumstances where by the Harter Act he was [*not*] relieved from responsibility."

[1] Act of Feb. 13, 1893, 27 Stat. 445. The Act has now been superseded by the Carriage of Goods by Sea Act of 1936, 49 Stat. 1207, 46 U. S. C. § 1300 *et seq.,* but any changes are not relevant to the issues here involved.

safety in operation could be achieved and undue imposition by carriers eliminated.

The carriers sought to avoid these obligations by special contracts or stipulations in bills of lading, relieving them of liabilities which they would incur under the rules laid down by the courts in the absence of such agreements. Although the courts upheld some such efforts, they reserved the right to refuse to enforce contractual exemptions from liability which trenched upon judicial notions of public policy.[2] The most important limit thus set to the power of the carrier to contract out of his common-law liability was the rule that courts would strike down any stipulation which relieved the carrier for hire from liability for damage caused by its own negligence. Applied first by this Court to the railroads, *Railroad Co.* v. *Lockwood,* 17 Wall. 357, the doctrine was extended to carriers by sea a few years later in *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397. Underlying the decision was the premise that such an agreement, if enforced, would tend to relax the vigilance and care in seamanship which the threat of liability encouraged. See *Railroad Co.* v. *Lockwood, supra,* at 371, 377–378.

The process by which this body of rules and exceptions was developed is typical of the growth of judge-made law in our system. Without legislative guidance, judges in deciding cases are necessarily thrown upon their own resources in ascertaining the public policy applicable to particular situations.

---

[2] The courts based this reservation upon the observation that such contracts were not in fact consensual agreements. The shipper had little choice but to accept the carriers' terms. See, *e. g., Railroad Co.* v. *Lockwood,* 17 Wall. 357, 379; *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397, 441. This circumstance did not necessarily void the agreement, since many stipulations were upheld. But it provided justification for refusing to enforce those which offended judicially pronounced public policy.

The judge's function and responsibility become otherwise once the legislature has formulated public policy. Courts are then no longer at large. They must carry out the defined policy and disregard their own determination of what the public good demands. See *Twin City Co.* v. *Harding Glass Co.*, 283 U. S. 353, 357. By the Harter Act, Congress supplanted the judicial view of public policy with its own ideas. The legislation, as is so often the case, represents a compromise among competing interests. The carriers were relieved of their judicially imposed insurers' liability. In return they were required to forego the possibility of avoiding by contract certain specified obligations. Finally, if those obligations were in fact performed,[3] recovery against the carrier for damages to cargo due to faulty navigation was altogether disallowed. This provision, embodied in § 3 of the Harter Act,[4] necessarily expressed a rejection of the judicially conceived premise as to public policy which was the foundation of the decisions which antedated legislation, namely, that liability for negligent navigation was a necessary spur to the carrier's exercise of care. Since that premise has been discarded by Congress, no justification remains for us to revive it as a basis for striking down the agreement here in question. "The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." *John-*

---

[3] This proviso was eliminated by the Carriage of Goods by Sea Act of 1936, 49 Stat. 1207, 1210, 46 U. S. C. § 1304.

[4] 27 Stat. 445.

*son* v. *United States,* 163 F. 30, 32 (per Holmes, J.);
see Landis, Statutes and the Sources of Law, in Harvard
Legal Essays, 213.

To be sure, the Harter Act did not in terms prescribe
that the carrier should have recovery over against cargo
for the amount of its liability to a non-carrying ship,
attributable to payments made by the non-carrier for
damage to cargo in a collision for which both vessels were
to blame. Hence we held in *The Chattahoochee,* 173 U. S.
540, that no such recovery was available to a carrier by
mere force of the Act. Similarly, and in the same period
shortly after the passage of the Harter Act, we held that,
since the Act did not specify that the carrier should par-
ticipate in a general average [5] when the peril to which
it related was the result of the carrier's faulty navigation,
no such participation could be had if the carrier had not
stipulated for it. *The Irrawaddy,* 171 U. S. 187. But
when a carrier did contract for such participation, the
force of the Harter Act required· this Court to sustain
the stipulation. *The Jason,* 225 U. S. 32.

"Instead of merely sanctioning covenants and agree-
ments limiting [the shipowner's] liability, Con-
gress went further and rendered such agreements
unnecessary by repealing the liability itself, declaring
that if the shipowner should exercise due diligence
to make the vessel in all respects seaworthy, and prop-
erly manned, equipped and supplied, neither the ves-

---

[5] The general average is a doctrine of maritime law which provides
that where a portion of ship or cargo is sacrificed to save the residue
from peril of shipwreck, each owner of property saved contributes
in proportion to the value of that property to make up the loss
of those whose property has been sacrificed for the common benefit.
It was characteristic of Dean James Barr Ames's power of fertile
generalization to find in the maritime doctrine of general average
manifestation of the more comprehensive quasi-contractual principle
against unjust enrichment.

sel, her owner or owners, etc., should be responsible for damage or loss resulting from faults or errors in navigation or in the management of the vessel, etc., etc. The antithesis is worth noting. Congress says to the shipowner—'In certain respects you shall not be relieved from the responsibilities incident to your public occupation as a common carrier, although the cargo owners agree that you shall be relieved; in certain other respects (provided you fulfill conditions specified) you shall be relieved from responsibility, even without a stipulation from the owners of cargo.' " *The Jason, supra,* at 50–51.

"In our opinion, so far as the Harter Act has relieved the shipowner from responsibility for the negligence of his master and crew, it is no longer against the policy of the law for him to contract with the cargo-owners for a participation in general average contribution growing out of such negligence; . . . ." *Id.,* at 55.

The present case bears exactly the same relation to *The Chattahoochee* that *The Jason* bore to *The Irrawaddy.* To revive notions of public policy which Congress rejected in 1893, disregards the appropriate considerations that governed application of the Harter Act in the earlier decisions.[6] To derive from a statute, which relieves a

---

[6] Reliance by the Court on *The Kensington,* 183 U. S. 263, is surely misplaced, and the quotation from it must be put in its setting. That was a case in which recovery was sought for damage to a passenger's baggage, although the ticket contained a stipulation against the carrier's liability. The Court noted that the Harter Act immunity from liability for negligence applied only to vessels "when engaged in the classes of carriage coming within the terms of the statute." *Id.,* at 268. Without deciding whether passengers' baggage was such a class of carriage, the Court struck down the stipulation on the ground that, if the Harter Act applied, the agreement was void as violative of the Act in that it sought immunity for negligent

248

ship entirely of liability to cargo when the ship is wholly to blame for the loss, an implied restriction against a voluntary arrangement for relief from liability when the ship is only half to blame, is surely an odd use to which to put such a statute. When this Court does fashion a rule of public policy it ought to be less perverse and illogical than that in its operation.

It is suggested, however, that the real meaning of the Harter Act is that carriers are remitted to Congress for whatever immunities they were to be granted. That is a most doctrinaire view to take of the legislation, and *The Jason, supra,* disposes of the notion.[7] What Congress did was to legislate generally about the relations between carrier and cargo in seagoing commerce. Generally, but not comprehensively as though it formulated a maritime code excluding all consensual arrangements within the

stowage, specifically forbidden by the Act; if the carriage of passengers' baggage was not among the classes exempted from liability by the Act, then of course, the cases voiding such stipulations with respect to baggage retained their force. Certainly a decision affirming the continued applicability of these cases as to baggage, goods for which Congress has not withdrawn carrier liability for negligence, and in any event not for negligent stowage, is totally inapposite to the question whether pre-existing case law should be applied to cargo, where Congress has granted the carrier immunity from such liability.

[7] But even if it did not, the argument appears to be drawn from the blue. It would have basis in reality if Congress had, by the Harter Act, carved an exception from a pre-existing rule outlawing all agreements between shipper and carrier regarding liability. The general prohibition would continue in force because the Harter Act would have been a defined, limited qualification. But there was no such rule, either judge-made or statutory. Congress had taken no action. And this Court did not outlaw such agreements generally. It struck down specific agreements for specific reasons grounded in its view of public policy. That premise of policy was denied validity by the Harter Act. It smacks of the fanciful to suggest that what Congress really did was to raise a proviso to an existing absolute rule based on that premise.

industry. That legislation "indicate[s] or require[s] as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind." *Johnson* v. *United States, supra,* at 32. We should heed the admonition of Mr. Justice Holmes "that courts in dealing with statutes sometimes have been too slow to recognize that statutes even when in terms covering only particular cases may imply a policy different from that of the common law, and therefore may exclude a reference to the common law for the purpose of limiting their scope." *Panama R. Co.* v. *Rock,* 266 U. S. 209, 215–216 (Holmes, J., with Taft, C. J., McKenna and Brandeis, JJ., dissenting). This is such a statute. I would recognize that the Congressional pronouncement of public policy—when it exempted carriers from liability for faulty navigation—precludes our striking down the clause here in issue.