**ALLSEAS MARITIME S.A., et al., Plaintiffs,**

**v.**

**M/V MIMOSA, her engines, tackle, apparel, etc., Defendant.**

**Civ. A. Nos. H–79–2303, H–79–2311, H–80–949 and H–80–2829.**

United States District Court, S.D. Texas, Houston Division.

Oct. 31, 1983.

Theodore G. Dimitry and Henry S. Morgan, Jr., at Vinson & Elkins, Houston, Tex., for Crowncen Intern., N.V., Crown Cent. Petroleum Corp. and Conoco Intern., Inc., claimants in H–80–949 and H–80–2829 and plaintiff in H–79–2311.

Richard G. Ashworth, Haight, Gardner, Poor & Havens, New York City, and Alan S. Dale, Eastham, Watson, Dale & Forney, Houston, Tex., for Burmah Oil Tankers, Ltd., plaintiff in H–80–949 and H–79–2303 and claimant in H–80–2829.

Edward D. Vickery, Royston, Rayzor, Vickery & Williams, Houston, Tex., and Howard M. McCormack, Healy & Baillie, New York City, for Juniper Shipping Ltd., plaintiff in H–80–2829 and claimant in H–80–949.

Thomas A. Brown, Brown, Sims & Ayre, Houston, Tex., for Vizies Offshore Towing.

Robert Eikel, Eikel & Davey, Houston, Tex., for Ayers S.S. Agency.

Bryan L. Berwick, Austin, Tex., for the State of Tex.

## MEMORANDUM OPINION

SINGLETON, Chief Judge.

### I. BACKGROUND OF THE PROCEEDING

On November 1, 1979 the M/V MIMOSA struck the BURMAH AGATE while the latter was in the customary anchorage area for the Port of Houston. Both were Liberian flag vessels, beneficially owned by Chinese interests. In the collision and its aftermath, thirty-five Chinese crewmen perished, much of the crude oil cargo was lost, and both ships became total constructive losses.

After two years of discovery and a hearing before a Marine Board of Investigation convened in New York by the Liberian government, the BURMAH AGATE and M/V MIMOSA interests settled all the death and injury claims in dispute between them and agreed upon an apportionment of their respective degrees of fault for collision liability. This apportionment, however, is not accepted by the cargo interests. In addition, the claims of cargo for the loss of most of the crude oil cargo and of the BURMAH AGATE for contribution in general average toward the costs of a fire-fighting and salvage effort remain unresolved.[1]

---

1. Cargo claimants state that they are resisting the claim for general average because they believe that the BURMAH AGATE'S insurers, who were in effective control of the ship after its abandonment, deliberately allowed the cargo to burn in order to avoid liability for pollution which would have resulted had the fire been extinguished.

Both the cargo claimants and vessel interests[2] agree that litigation of the many complex and technical questions surrounding the unsettled matters of percentage of fault for collision and liability for general average may be avoided if this court first will resolve two issues crucial to an adjudication of the cargo loss claim. These issues are: (1) The measure of damages for cargo's loss; and (2) The validity of the Both-to-Blame clause in the contract for affreightment between Burmah Oil Tankers Ltd. ("Burmah Oil") and Crowncen International, N.V. ("Crowncen"). A determination of the measure of damages for cargo loss will permit an estimation of the cargo interests' possible recovery if the case were to go to trial and, thus, allow a realistic discussion of settlement. A ruling on the validity and effect of the Both-to-Blame clause will determine whether the case can be settled on the basis of the cargo claimants' total loss or if percentages of fault for collision, general average, and deliberate sacrifice must be taken into account. Since a difficult and lengthy trial may be avoided if the parties are able to reach a settlement, they have stipulated to certain facts[3] and have asked the court to resolve the enumerated issues.

A hearing was held before the court on the cargo valuation and Both-to-Blame issues which previously had been thoroughly and extensively briefed. After careful consideration of the evidence and arguments presented at the hearing, the briefs and pleadings filed in this action, and the facts and law of this case, the court has reached the following conclusions:

(1) The measure of damages for the lost cargo is the value at the time and place of shipment. The place of shipment of the cargo aboard the BURMAH AGATE is South Riding Point, The Bahamas.

(2) The Both-to-Blame clause of the Crowncen-Burmah Oil contract is valid and enforceable.

The reasons for the court's determinations are discussed below in this memorandum.

## II. THE MEASURE OF DAMAGES FOR THE LOST CARGO

In this action, the cargo interests sue the noncarrying vessel, the M/V MIMOSA, and its owner, Juniper Shipping Ltd., in maritime tort. Although the M/V MIMOSA and BURMAH AGATE are joint tortfeasors vis-a-vis cargo, the BURMAH AGATE and its owner are contractually exempted from liability to cargo for loss resulting from negligent navigation, collision, or fire.[4] Consequently, cargo is seeking to recover damages for its entire loss of approximately 250,000 barrels of crude oil from Juniper Shipping, Ltd. and the M/V MIMOSA.

The question of the measure of valuation for goods lost in transit by either land or sea under a tort theory of recovery is seldom litigated. In this instance, however, an unusual circumstance—the oil crisis of

2. The cargo claimants are comprised of Crowncen International, N.V., Crown Central Petroleum Corporation, and Conoco International, Inc. The vessel interests include Burmah Oil Tankers, Ltd., owner of the BURMAH AGATE, and Juniper Shipping Ltd., owner of the M/V MIMOSA. There are additional parties to the lawsuit who are not concerned with the issues now before the court. These parties are Vizies Offshore Towing, Ayers Steamship Agency, and the State of Texas.

3. These facts are listed in paragraphs 5(a)–(m) of the Stipulation annexed to the parties' First Pretrial Order and paragraph (1)(n) of their Second Pretrial Order.

4. Crowncen-Burmah Oil Charterparty, Part II, Clause 19, provides in part:

"The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:—any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, * * *."

The Carriage of Goods by Sea Act ("COGSA"), to which the carriage is subject by Charter Clause 20, also exempts the carrier from liability for cargo loss or damage caused by negligent navigation or fire. 46 U.S.C. § 1304(2)(a) and (b).

1979, which precipitated a rapidly rising market price for crude oil around the time of the collision—precludes easy settlement or resolution of this issue. At the place and time of shipment from its African port, the cost of the oil cargo, plus insurance and freight, was approximately $25.00 per barrel. At the time and place of the collision, the cost of the oil cargo on the spot market was approximately $42.00 per barrel. As is apparent, where the lost crude oil is valued will make a significant difference in the amount of damages recoverable by the cargo interests from the M/V MIMOSA and her owner.[b]

The cargo claimants advance three alternative methods for determining the value of the crude oil lost in the collision. First, they argue that the traditional law of maritime tort, which measures cargo damages at the time and place of shipment, should be changed and made to conform to shore law which, under a tort theory of recovery, values lost or destroyed property at the time and place of loss. Second, and in the alternative, they contend that the cargo had arrived at its destination at the Port of Houston and that, by analogy to contract principles, the lost cargo should be valued at the market price in Houston.[6] Third and alternatively, the cargo claimants assert that if their first two theories are rejected in favor of the prevailing maritime collision rule, South Riding Point (SRP) in the Bahamas should be considered the point of shipment rather than the African port of embarkation, since at SRP the crude oil was transferred from very large crude carriers (VLCCs) to smaller ships, including the BURMAH AGATE, for transport to Houston.

In response to cargo's arguments, the vessel interests take the position that the traditional maritime rule, as articulated in *The GLENORCHY*, should be applied to this case and that the proper measure for cargo's damages is cargo's value at the time and place of shipment.[7] They further contend that the place of shipment was the African port of embarkation. The vessel interests also admonish the court that ignoring or overruling the rule of *The GLENORCHY* would be tantamount to overruling *Brown v. The Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, in a school desegregation case.

In *Standard Marine Insurance Co. Ltd. v. Scottish Metropolitan Insurance Co., Ltd., The GLENORCHY*, 283 U.S. 284, 51 S.Ct. 371, 75 L.Ed. 1037 (1931), a case involving a collision, in the Great Lakes, the Supreme Court reiterated the well-encrusted rule of cargo damage in maritime tort cases that the "recoverable value of cargo lost or damaged at sea is that at time and place of shipment, without allowance for increase of value or anticipated profits." *Id.* at 288–89, 51 S.Ct. at 372–73. Cargo claimants contend that this rule reflects past problems of proving a value for cargo lost in the middle of the ocean at a distance from established markets. They argue that with today's worldwide market for oil, which permits oil to be bought and sold anywhere in the world, including when still enclosed in the hold of a ship in transit from one port to another, there is no longer any proof problem connected with the valuation of an oil cargo lost at sea. Consequently, they contend, there is simply no longer any valid reason to preserve the

---

**5.** This difference is estimated to be approximately $10,000,000.

**6.** Under the rule of *The RUSSIA*, 21 Fed.Cas. 86 & 89 (S.D.N.Y.1869 and 1871) the value of cargo damaged after the vessel has arrived, and thus no longer in transit, is to be measured by its market value at destination. In *The RUSSIA*, the cargo was damaged while the carrying vessel was awaiting a berth in the N.Y. harbor.

In *The ALEPPO*, decided by the same judge three years after *The RUSSIA*, the court reiterated the rule that a ship must have arrived at its

destination before cargo may be valued at the point of destination and made it clear that a ship was "arrived" only after the perils of voyage are over and a safe arrival at destination is no longer "purely a matter of conjecture." *The ALEPPO*, 1 Fed.Cas. 342 (S.D.N.Y.1874).

**7.** The actual rule mandated by *The GLENORCHY* for recovery in tort for lost or damaged cargo was "the value of the cargo at the time and place of shipment, plus the expense of getting the cargo to the point where it was lost."

rule of *The GLENORCHY*, and no reason why the law of recovery of damages in marine tort should not be brought in line with that used on land.

The vessel interests disagree with this analysis of the rule and counter that the development of a worldwide market in oil is irrelevant. They argue that the principle expressed in *The GLENORCHY* and earlier decisions is that increase in value or anticipated profits, which would have accrued if the voyage had been completed and cargo not lost, are to be excluded, *see id.*, and damages awarded that would restore the cargo owner to the position it was in before the collision without rewarding it for a rising market. Kasanin, *Cargo Rights & Responsibilities in Collision Cases*, 51 Tulane Law Review, 880, 889 n. 68 (1977).[8] This exclusion of profits and increase in cargo value reflects the special hazards of marine transport and the attendant possibility that goods consigned to a ship will not reach their destination.

■ An evaluation of the arguments and evidence presented in this case persuades this court that the position of cargo claimants has a great deal of merit. This court is of the opinion that if the Supreme Court were again faced with the issue of measuring the value of cargo lost at sea, it would reconsider and modify the rule of *The GLENORCHY*. Nevertheless, a district court is required by its role and position in the federal judiciary to follow the decisions of the Supreme Court irrespective of their age or questionable validity. *Hendricks County Rural Electric Membership Corp. v. N.L.R.B.*, 627 F.2d 766, 769 (7th Cir. 1980), *cert. granted* 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 612, *rev'd on other grounds*, 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981); *Patterson v. Brown*, 393 F.2d 733, 736 (10th Cir.1968); *Quilici v. Village of Morton Grove*, 532 F.Supp. 1169, 1181 (N.D.Ill.1981); *see Joiner v. City of Dallas*, 380 F.Supp. 754, 773 (N.D.

Texas), *aff'd*, 419 U.S. 1042, 95 S.Ct. 614, 42 L.Ed.2d 637 (1974), *reh. denied*, 419 U.S. 1132, 95 S.Ct. 818, 42 L.Ed.2d 831 (1975). Therefore, since this court has determined that the case *sub judice* is indistinguished from *The GLENORCHY*, the latter controls its disposition. Accordingly, this court holds that damages for the loss to cargo will be measured as of the time and place of shipment.

Having decided that *The GLENORCHY* is controlling precedent, this court must still determine the place of shipment for the BURMAH AGATE cargo. The parties are in disagreement on this issue. The cargo claimants assert that SRP in The Bahamas is the place of shipment, essentially because it was at this transshipment port that the cargo which was lost in the collision was physically placed on board the BURMAH AGATE. The vessel interests respond that SRP was little more than a way station along the ocean route from Africa to Houston and instead urge that the African port specified in the transportation contracts is the place of shipment for purposes of valuing the crude oil cargo lost in the collision.

The following facts have been considered by the court in determining whether Africa or SRP was the point of shipment:

(1) SRP terminal is operated by Burmah Oil to handle crude oil shipped from overseas and destined for ports in the eastern and Gulf states of the United States. Its facilities are used to store large quantities of oil, to load or unload oil, and to transfer oil from VLCCs to smaller vessels.

(2) The crude oil cargo of the BURMAH AGATE was transported from Africa to SRP aboard four VLCCs of different ownership. At SRP part of the VLCC JONNY cargo was pumped through the terminal's loading facility into the BURMAH AGATE; the remainder of her cargo was a composite made up of portions of the cargoes of

---

**8.** The vessel interests argue that the legal principle set forth in *The GLENORCHY* excludes rewarding cargo for anticipated profits and also rejects penalizing cargo for a falling market. If the rule of *The GLENORCHY* proscribes taking

into account a rising market, the obverse would seem to be true. However, there is no language indicating that this is the case in any of the cases relied on by Burmah Oil and Juniper Shipping, Ltd.

the three other VLCCs. These cargoes had been deposited first into the SRP storage facilities.

(3) Each VLCC issued a separate bill of lading for its cargo, designating one or more safe ports in Africa as the place of shipment and SRP as the destination. On only one bill of lading was further transshipment to Houston indicated; a part of the cargo covered by this bill of lading went into the makeup of the cargo of the BURMAH AGATE. Once the composite cargo was loaded on board the BURMAH AGATE, two new bills of lading were issued, one covering the Forcados Crude and the other covering the African Blend Crude. SRP was listed as the point of shipment, Houston as port of delivery.

(4) The shipment of the oil was made pursuant to two contracts of affreightment between Crowncen and Burmah Oil under which Burmah Oil agreed to supply vessels of the necessary tonnage over a period of several months for the transport of Crowncen's crude oil from West Africa to ports on the Atlantic coast or Gulf area of the United States.[9] These contracts contemplated that the oil would be sent through the SRP transsshipment terminal, but the freight rate for the carriage provided for one rate from Africa to the United States; the rate did not vary with the two different legs of the voyage.

Arguing from the aforementioned facts, the parties disagree as to their relative significance in establishing whether Africa or SRP is the point of shipment for the crude oil aboard the BURMAH AGATE. The cargo claimants elevate the importance of the bills of lading. They contend that the six bills of lading demonstrate that there were actually six separate shipments of the oil transported by Burmah Oil under the Burmah-Crowncen contracts and that two of those shipments, those carried by the BURMAH AGATE when it struck the M/V MIMOSA, had as their point of shipment the SRP terminal. They aver that a bill of lading is a document of some impor-tance because it evidences receipt by a carrier of a specific quantity of cargo to be transported, cargo for which a vessel has the responsibility of carrying and keeping intact.

In contrast to the bills of lading, the cargo claimants minimize the import of the contracts for affreightment as evidence of place of shipment since, regardless of the terms of the transportation contracts, Crowncen was free to transfer title to the oil being carried by Burmah Oil at anytime during a voyage. The destination of a specific load of cargo also could be altered from SRP onward to accommodate a particular buyer. Moreover, there was nothing in the affreightment contracts to prevent Crowncen from storing or otherwise changing the disposition of the cargoes carried by the VLCCs once they arrived at SRP terminal.

Finally, the cargo claimants contend that, applying the principle of *The GLE-NORCHY*, the risk of loss to the cargo of the BURMAH AGATE began, not at the African loading ports, but at SRP when the BURMAH AGATE was loaded for its voyage to Houston. Thus, they urge, the place of shipment should coincide with the commencement of the risk to that cargo.

For their part, the vessel interests take the position that the contracts for affreightment, not the bills of lading establish Africa as the place of shipment for the purpose of measuring damages. Under these contracts, they argue, Burmah Oil was obligated to carry all of Crowncen's crude oil, including that which eventually went into the hold of the BURMAH AGATE, from Africa to the United States for a through rate covering the entire carriage. They assert that SRP cannot be considered the place of shipment because it is simply a transsshipment terminal where all incoming oil is transferred from large ships to smaller ones for further carriage to the United States. In addition, since SRP is without facilities to refine or consume oil, the vessel interests argue that there is no market

---

**9.** The contracts specify "One or Two Safe Ports—West Africa" as the loading ports and "One or Two Safe USAC or U.S. Gulf Ports" as the discharging ports.

there by which to establish the value of the lost crude oil. They analogize SRP to areas of open ocean such as those off Trinidad and the mouth of the Mississippi River where VLCCs transship crude oil to smaller vessels by ship-to-ship transfer underway. Therefore, they reason, the only place that could be considered a viable point of shipment is Africa.

Also, the vessel interests claim, Crowncen's ability to transfer title to the crude oil while enroute does not abrogate the significance of the transportation contracts in establishing the place of shipment. In this case, title never was transferred, and the rights and obligations of the parties remained as set forth in the affreightment contracts.

In opposition to the cargo claimants' point that SRP is the place of shipment because it coincides with the attachment of the risk to the BURMAH AGATE's cargo, the vessel interests answer that, on the contrary, the risks of ocean carriage attached to the cargo from the moment it was loaded on the VLCCs in Africa. Further, they point out, it was insured by Crowncen for both legs of the carriage at its value at time and place of shipment from Africa; neither the Forcados Crude nor African Blend aboard the BURMAH AGATE was insured for an additional amount to cover profits anticipated when delivery was made in the United States. This, the vessel interests state, illustrates that the cargo interests understood that damages for cargo lost at sea were to be measured as of time and place of shipment from Africa.

Distilling the litigants' primary arguments, they appear to be the following: cargo claimants equate a shipment with the physical placement of cargo aboard a vessel and reason from this premise that since the BURMAH AGATE's cargo was pumped on board it at SRP, that cargo

constitutes a separate shipment.[10] It then follows that the place of shipment is SRP. The vessel interests claim that it is the contracts for affreightment which determine place of shipment; since the contracts designate "safe loading ports" in Africa as the place of shipment, this is the place of shipment for the BURMAH AGATE cargo. The vessel interests also contend that a transshipment terminal such as SRP cannot be a place of shipment. While the vessel interests do not define or discuss the meaning of "shipment" as do cargo claimants, two possibilities are implicit in their position. The first is that the approximately 250,000 barrels transported by Burmah Oil constitutes one shipment; the second is that there were four shipments, corresponding to the four voyages of the VLCCs.

There is virtually no case law to guide the court in deciding whether SRP terminal or Africa is the point of shipment. While The GLENORCHY and its predecessors held that the "recoverable value of cargo lost or damaged at sea is that at time and place of shipment ...," 283 U.S. at 288–89, 51 S.Ct. at 372–73, they were unconcerned with defining "place of shipment" and give no clue as to how it is to be determined.

The VAUGHN and The TELEGRAPH, 14 Wall. (81 U.S.) 258, 20 L.Ed. 807 (1871), is cited by the vessel interests to support their contention that an intermediate transshipment port cannot be a "place of shipment" for the purpose of valuing cargo. In that case, cargo destined for New York City was loaded onto a canalboat at a port near Montreal; from there the canalboat was towed by a tug to a terminal in Troy, New York. The canalboat and another boat were then picked up by a steamer and towed down the Hudson River where the cargo was lost in a collision. In determining the measure of damages recoverable by

---

**10.** The cargo claimants actually consider that the BURMAH AGATE's cargo consists of two shipments, one of Forcados Crude, and the other of African Blend, since a separate bill of lading was issued for the two different types of oil. However, since it is more convenient to refer to the entire cargo as one shipment and since it does not make any difference in the determination of place of shipment, the cargo of the BURMAH AGATE will be spoken of as comprising one shipment rather than two.

cargo from the colliding vessel, the Supreme Court held that the Canadian port was the "place of shipment" rather than Troy, New York.

The *VAUGHN and The TELEGRAPH*, however, is distinguishable from the case *sub judice*. In that case, once the cargo that subsequently became lost at sea was first loaded in Canada, it was never unloaded. The tugs changed, but the cargo remained on the same canalboat. In contrast, the cargo which went down with the BURMAH AGATE was unloaded from the VLCCs and later loaded onto the BURMAH AGATE. Thus, *The VAUGHN and The TELEGRAPH* does not dispose of the possibility that SRP may be considered a point of shipment.

■ This court is persuaded by the cargo claimants that their position is the correct one. Three facts stand out as particularly salient: (1) The cargo that was lost while aboard the BURMAH AGATE was physically placed aboard that vessel at SRP terminal; (2) not all of the oil making up the BURMAH AGATE's cargo was pumped onto it through the transshipment facilities directly from one of the VLCCs; a portion of the oil was pumped from storage facilities; and (3) regardless of the terms of the contracts for affreightment, the disposition of the crude oil was subject to change at SRP at the behest of Crowncen; the oil could have been stored at the terminal, delivery directed to a port other than one on the Gulf or the Atlantic coast, or sold to third parties who could have altered its destination. These facts add up to a scenario in which it is logical to conceive of the cargo aboard the BURMAH AGATE as a separate and distinct shipment.

This interpretation of the facts comports with what appears to be the common understanding of the term "shipment" in the maritime context. As defined in De Kerchove's *International Maritime Dictionary* 724 (2d ed. 1961), a "shipment" is "the act of placing goods on board a vessel." In *Black's Law Dictionary* 1540 (4th ed. 1968), "shipment" is defined as the "[d]elivery of goods within the time re-

quired on some vessel, destined to the particular port, which seller has reason to suppose will sail within a reasonable time." In the revised edition of this same dictionary, it is defined as "[t]he delivery of goods to a carrier and his issuance of a bill of lading therefor.... A consignment of goods as delivered by the carrier." *Black's Law Dictionary* 1235 (rev. 5th ed. 1979). Case law also suggests that the traditional view of a "shipment" contemplates carriage of a specific cargo by a specific ship. For instance, in *The GLENORCHY* the Court, in explaining the reason for the traditional marine rule of damages to cargo, states, "the cargo is placed at risk when the voyage begins." 283 U.S. at 288, 51 S.Ct. at 372. Implicit in this sentence is the Court's view that a shipment is a discrete unit of cargo transported by a particular ship to some destination.

A decision that the BURMAH AGATE cargo is a shipment and that SRP is the place of shipment would also be in harmony with the principle underlying the rule of *The GLENORCHY* that the risks to cargo of ocean transport should be borne by cargo. "The cargo is placed at risk when the voyage begins. Its value then is the measure of the risk and of the loss suffered if the cargo is lost or damaged on the voyage." Id. at 288–89, 51 S.Ct. at 372–73. For the cargo of the BURMAH AGATE, the risk of loss began when the voyage of that vessel commenced. Any risk to which the oil was subject while being transported from Africa to SRP was over when the VLCCs reached the transshipment terminal. Therefore, the measure of the risk and of the loss suffered by the BURMAH AGATE should be measured from SRP.

Finally, contrary to the vessel interests' contention, in view of the fact that today there is a worldwide market for oil, there would be no difficulty in establishing a market value for the crude oil at SRP.

Accordingly, for the reasons given above, this court concludes that the oil lost when the BURMAH AGATE and M/V MIMOSA collided will be valued at the time

and place of shipment from South Riding Point, The Bahamas.

## III. THE VALIDITY OF THE BOTH–TO–BLAME CLAUSE

If the Both-to-Blame clause of the contract for affreightment between Crowncen and Burmah Oil is upheld, the cargo interests will be required to reimburse Burmah Oil to the extent that the amount of damages payable to cargo has been included in the division of damages between the colliding ships.[11] The cargo claimants contend that the Both-to-Blame clause in the Crowncen-Burmah Oil contract is rendered invalid by the specific incorporation of the Carriage of Goods by Sea Act (COGSA) and that, consequently, cargo may recover full damages from the M/V MIMOSA interests without having to surrender any of this recovery to Burmah Oil. The cargo claimants rely on the Supreme Court decision in *U.S. v. Atlantic Mutual Insurance Co.,* 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907 (1952) to support their position.

The vessel interests counter that the cargo interests have misread *Atlantic Mutual* and are mistaken in their assertion that the effect of COGSA is to invalidate Both-to-Blame clauses. They construe *Atlantic Mutual* to mean that regardless of COGSA, Both-to-Blame clauses in contracts for common carriage are void and unenforceable "as a violation of the longstanding rule of law which forbids common carriers from stipulating against the consequences of their own or their employees' negligence." 343 U.S. at 239, 72 S.Ct. at 668. They aver that since the Crowncen-Burmah Oil contract is one for private carriage rather than common carriage, the incorporation of COGSA has no effect on the validity of the Both-to-Blame clause.

In response, claimants first assert that the public policy underlying COGSA requires the prohibition of Both-to-Blame clauses in contracts for common carriage. Although conceding that the same cannot be said for COGSA and private carriage contracts, they argue that in this case the specific incorporation of COGSA into the Crowncen-Burmah Oil Charter, even though a contract for private carriage, requires that any contractual provision repugnant to COGSA, such as a Both-to-Blame clause, be invalidated.

It appears to this court that cargo's argument that the Both-to-Blame clause is invalidated by the incorporation of COGSA into the Crowncen-Burmah Oil contract entails the following logical steps:

1. Cargo implicitly concedes that absent the incorporation of COGSA in the charter, the Both-to-Blame clause would be valid and enforceable;

2. As decided in *Atlantic Mutual,* Both-to-Blame clauses in common carriage are void under COGSA;

3. Even though the case at bar involves a contract for private carriage, the incorporation of COGSA into the charter nullifies the Both-to-Blame clause.

An evaluation of cargo's position reveals it to be fallacious in two respects: (1) *Atlantic Mutual* does not stand for the proposition that COGSA invalidates Both-to-Blame

---

11. Under the rule of *The CHATTAHOOCHEE,* 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899), if a collision occurs in which both ships are at fault, the loss to cargo becomes part of the total damages to be proportionately allocated under the proportional fault rule of *United States v. Reliable Transfer,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

To illustrate how the Both-to-Blame clause works in a hypothetical case:

(1) There is a collision in which both vessels were at fault. The carrying vessel was 75% at fault, and the noncarrying was 25% at fault.
(2) The total amount of damages is $1,000,-000. (This amount represents damage to both ship and to cargo.) Of this amount, $200,000 represents damage to cargo.
(3) The noncarrying vessel can recover $750,-000 from the carrying vessel (75% of $1,000,-000.) However, if there had been ño damage to cargo, then the noncarrying vessel only would have had to pay $600,000 to the noncarrying vessel. (75% of $800,000.)
(4) There is difference of $150,000 because of damage to cargo which is included in the apportionment of damages. With a valid Both-to-Blame clause, the carrying vessel is reimbursed by cargo for the $150,000 difference.

clauses in common carriage contracts, and (2) the public policy underlying COGSA cannot be understood as prohibiting such negligence clauses.

In *Atlantic Mutual,* the steamship, NATHANIEL BACON, owned and operated by the United States as a common carrier, collided with the ESSO BELGIUM, and cargo was lost. A lawsuit ensued to determine liability for the damages sustained by the cargo owners for lost cargo and by the shipowners for physical damage to the ships. The question presented on appeal to the Supreme Court was whether the Both-to-Blame clause in the bill of lading issued by the NATHANIEL BACON to the cargo owners was valid. The cargo owners contended that the clause was void and unenforceable because it violated the rule prohibiting common carriers from stipulating against the consequences of their own fault. The United States argued that § 3 of the Harter Act, as substantially reenacted in § 4(2) of COGSA, provided "special statutory exemption for ocean carriers from this general rule and that this exemption allowed them to stipulate against their own negligence." 343 U.S. at 239, 72 S.Ct. at 668. In its opinion, the Supreme Court observed that, although judge-made doctrine, the law prohibiting common carriers from stipulating for immunity from their own or their agents' negligence had been considered authoritative for over a century and had acquired the force of a legislative enactment. *Id.* After considering whether COGSA had created out a special statutory exemption to the well-established prohibition against Both-to-Blame clauses in common carriage, the Court concluded that it had not. The Court held that neither the Harter Act nor COGSA was designed by Congress to modify or change the existing rule that common carriers cannot contractually avoid liability for their own or their employees' fault. *Id.* at 242, 72 S.Ct. at 669.

A careful reading of *Atlantic Mutual* reveals that the Supreme Court did not hold that COGSA invalidates Both-to-Blame clauses. Rather, the Court held that, notwithstanding the enactment of COGSA, Both-to-Blame clauses in contracts for common carriage are still outlawed. Since it is federal common law and not COGSA that invalidates Both-to-Blame clauses, the incorporation of COGSA will not nullify a Both-to-Blame clause in a private carriage agreement.

█ Neither COGSA nor the public policy underlying it indicates that Both-to-Blame clauses are disfavored. In fact, COGSA provides that a carrying vessel shall not be liable for cargo damage resulting from errors in navigation. 46 U.S.C. § 1304(2)(a).[12] Moreover, unlike the situation with common carriage, there is no rule or policy against the inclusion of Both-to-Blame clauses in private carriage. On the contrary, there is authority that maritime law permits parties a great deal of latitude in private contracts and that in private carriage "the parties may contract pretty much as they please." *THE MONARCH OF NASSAU,* 155 F.2d 48, 50 (5th Cir. 1946).

Finally, this court notes that while the issue of the enforceability of Both-to-Blame clauses in contracts for private carriage rarely has been litigated (and never litigated when COGSA was incorporated into the agreement), in the only two reported cases, the district courts have upheld their validity.[13]

---

**12.** The Both-to-Blame clause is intended to have the same result, albeit indirectly. Absent a Both-to-Blame clause, when a collision occurs in which both ships are at fault, the carrying vessel is in effect held liable for cargo damage because of the rule of *The CHATTAHOOCHEE.* With a Both-to-Blame clause, the carrying vessel is reimbursed by cargo for that part of the total damages attributable to cargo damage and, thus, in actuality is not held responsible to cargo for negligence.

**13.** In *Alamo Chemical Transportation Co. v. M/V OVERSEAS VALDES,* 469 F.Supp. 203 (E.D.La.1979) the court upheld the Both-to-Blame clause in a contract for affreightment in a barge charter party contract, stating that, in the context of a private carrier under a charterparty, the Both-to-Blame clause is valid and controls the rights and obligations of the parties thereto. 469 F.Supp. at 215.

Therefore, for the reasons stated above, this court decides that the Both-to-Blame clause in the contract for affreightment between Crowncen and Burmah Oil is valid and effective.

In *American Union Transport, Inc. v. U.S.,* 1976 AMC 1488 (N.D.Cal.1975), involved an action by the American Union Transport, Inc. against the U.S., who was the cargo owner to recover on the basis of a Both-to-Blame clause. The U.S. asserted as an affirmative defense that the clause was unenforceable and void as contrary to public policy. However, it was not an issue raised by either party on cross-motions for summary judgment. Nevertheless, the court upheld its validity, stating that the reason for its existence was to:

"... avoid the apparent conflict between this indirect liability of the carrying vessel and the policy of the Harter Act, and the anomaly of making the carrying vessel indirectly liable to cargo in a mutual fault collision but immune from liability to its cargo owner in a collision in which it was alone at fault."
1976 AMC at 1492.