

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-3-2006

# Ferrostaal Inc v. M/V Sea Phoenix

Precedential or Non-Precedential: Precedential

Docket No. 05-1837

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Ferrostaal Inc v. M/V Sea Phoenix" (2006). *2006 Decisions*. Paper 1011.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1011

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-1837

FERROSTAAL, INC.,
Appellant

v.

M/V SEA PHOENIX formerly known as M/V EXPRESS
PHOENIX; INTERWAY SHIPPING CO. LTD.; PACIFIC &
ATLANTIC CORP.; TRANS SEA TRANSPORT NV;
DELARO SHIPPING COMPANY LIMITED

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 03-cv-00164)
District Judge:  The Honorable Joseph H. Rodriguez

Argued January 17, 2006

Before: BARRY, AMBRO and ALDISERT, <u>Circuit Judges</u>

(Opinion Filed: May 3, 2006)

George R. Zacharkow, Esq. (ARGUED)
Mattioni Limited
399 Market Street
Philadelphia, PA 19106

<u>Counsel for Appellant</u>

A. Robert Degen, Esq. (ARGUED)
Fox Rothschild
2000 Market Street, 10th Floor
Philadelphia, PA 19103

Counsel for Appellees Pacific & Atlantic Corp.
and Delaro Shipping Company Limited


Patrick F. Lennon, Esq. (ARGUED)
Tisdale & Lennon
10 Spruce Street
Southport, CT 06890
        -AND-
Frank P. DeGiulio, Esq.
Palmer, Biezup & Henderson
300 Market Street
Camden, NJ 08102

Counsel for Appellee Trans Sea Transport, etc.

_____

OPINION OF THE COURT

_____


BARRY, Circuit Judge

       Appellant Ferrostaal claims that steel coils belonging to it were damaged in transit from Tunisia to New Jersey. The District Court granted partial summary judgment to the defendants, now appellees, holding that the Carriage of Goods by Sea Act ("COGSA"), ch. 229, 49 Stat. 1207 (1936), 46 U.S.C. app. §§ 1300-1315, limited their liability to Ferrostaal to $500 per package. Ferrostaal appeals, arguing that COGSA does not govern this transaction and that the "fair opportunity" doctrine precludes enforcement of the $500 limitation. We hold that the District Court correctly analyzed the choice of law question and that the fair opportunity doctrine is inconsistent with COGSA. We will, therefore, affirm.

2

# I. Facts and Procedural History

The Delaro Shipping Company ("Delaro"), of Cyprus, owned the Sea Phoenix, a Cypriot-flagged cargo ship. By an agreement (the "Charter Party") dated November 21, 2002, Trans Sea Transport, N.V. ("TST") of the Netherlands Antilles, chartered the Sea Phoenix for $7,000 a day.[1] The Sea Phoenix was to be delivered into TST's control on or about November 24 or 25, 2002, at Porto Marghera, Italy. TST directed the Sea Phoenix to Bizerte, Tunisia, where, on or about December 15, it took aboard a shipment of coils of galvanized steel. The shipper was Tunisacier International S.A., of Tunisia; the shipment was to be discharged at the Novolog terminal in Philadelphia and consigned to the order of Ferrostaal Inc., a Delaware corporation ("Ferrostaal"). The bills of lading ("Bills of Lading") issued by TST for the relevant portion of the shipment, written on a standard form called a CONGENBILL,[2] indicate in the section labeled "number and kind of packages; description of goods" that the shipment contained 402 coils, weighing a total of 3,628,480 kilograms. The total cost of the shipment was $171,861.14. Man Ferrostaal AG, Ferrostaal's German parent

---

[1] The Charter Party is a standard New York Produce Exchange time charter form modified with extensive strikeouts and an additional seventeen pages of terms. It contains one clause explicitly incorporating COGSA by reference and another requiring arbitration of any disputes in London under English law.

[2] Especially by contrast with the Charter Party, the Bills of Lading are clear and concise. Their boilerplate terms—a total of five clauses—fit on the back of the sheet of paper that lists the cargo manifest and the parties. Clause 1 purports to incorporate by reference the terms of a charter party "dated as overleaf." No such date was provided; no charter party was named. Neither party argues that the Charter Party should be deemed incorporated into the Bills of Lading. Clause 5, the "Both-to-Blame Collision Clause," is unenforceable under United States law. See United States v. Atl. Mut. Ins. Co., 343 U.S. 236, 241 (1952).

company, insured the coils, "full risk from warehouse to warehouse," through an Italian branch of the global Ace Insurance Group. The insurance policies indicate a total value for the coils of roughly $2 million.

The Sea Phoenix unloaded the coils in Gloucester City, New Jersey, on or about January 13, 2003. Ferrostaal claims that 280 of the coils had been exposed to seawater, causing them to rust. It estimates the total damage at $507,892. On January 15, Ferrostaal sued the Sea Phoenix, Delaro, and TST in the United States District Court for the District of New Jersey.[3] The complaint alleged that the damage was the result of the unseaworthiness of the Sea Phoenix, the defendants' negligence, or breach of the contract of carriage.

Delaro and TST moved for partial summary judgment, claiming that COGSA § 4(5) limited their liability to $500 per package. That section provides:

> "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading."

46 U.S.C. app. § 1304(5). They claimed that the Bills of Lading did not include a declaration of the "nature and value of such goods" and that, therefore, the $500 limit applied, limiting their total liability to $140,000. In response, Ferrostaal argued that

---

[3] The complaint also named as defendants the Interway Shipping Company and the Pacific and Atlantic Corporation. Interway was dismissed by stipulation on December 10, 2003. Pacific and Atlantic, the manager of the Sea Phoenix, is a Liberian company whose principal office is in Greece. It did not join in the motion for partial summary judgment and is not a party to this appeal.

4

the Hamburg Rules, a competing set of terms for shipping agreements with a higher limit, should apply instead. Ferrostaal also argued that the fair opportunity doctrine rendered the $500 limit unenforceable. Under that doctrine, the $500 limit does not apply unless the carrier provided the shipper with notice of the limit and an opportunity to declare a higher value for its goods in the bill of lading. Ferrostaal claimed that the Bills of Lading neither mentioned the $500 limit of COGSA § 4(5), nor contained a space in which the actual value could have been inserted.

On December 14, 2004, the District Court granted the motion for partial summary judgment. It found, first, that COGSA, rather than the Hamburg Rules, applied to the shipment. Ferrostaal had not shown that Tunisian law required application of the Hamburg Rules, and the Bills of Lading indicated an intent to contract into COGSA rather than the Hamburg Rules. The District Court then applied the fair opportunity doctrine. Because we have not articulated a fair opportunity test, the District Court relied on the test adopted by the Court of Appeals for the Second Circuit, and concluded that the Bills of Lading provided Ferrostaal with the necessary opportunity. The Bills of Lading, the District Court found, provided notice of the $500 limit by unambiguously selecting COGSA as the governing legal regime. The section of the Bills of Lading in which the number and weight of the coils were indicated provided the space in which a higher value could have been inserted.

At Ferrostaal's request, the District Court certified for immediate appeal, pursuant to 28 U.S.C. § 1292(b), the following issue: "an ocean carrier's right to invoke [COGSA] in order to limit recovery of damages without having incorporated any reference to COGSA or COGSA's $500 per package limitation in the Bill of Lading . . . ." App. 2a. We granted leave to appeal.

5

## II.  Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1333(1) as a "civil case of admiralty or maritime jurisdiction." We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(b).  Our jurisdiction extends to all questions included in the summary judgment order, not just the particular issue certified for immediate appeal.  Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 204-05 (1996).  We review de novo the District Court's grant of summary judgment.  See Foulk v. Donjon Marine Co., 144 F.3d 252, 257-58 (3d Cir. 1998). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  All reasonable inferences from the evidence must be granted to the non-moving party.  See Serbin v. Bora Corp., 96 F.3d 66, 69 n.2 (3d Cir. 1996).

Determinations of the content of foreign law are questions of law, see Fed. R. Civ. P. 44.1, and our review of them is plenary.  See Grupo Protexa, S.A. v. All Am. Marine Slip, 20 F.3d 1224, 1239 (3d Cir. 1994).  "The court, in determining foreign law, may consider any relevant material . . . whether or not submitted by a party . . . ." Fed. R. Civ. P. 44.1.  We may consider materials not considered by the District Court.  Grupo Protexa, 20 F.3d at 1239.  "This rule provides courts with broad authority to conduct their own independent research to determine foreign law but imposes no duty upon them to do so."  Bel-Ray v. Chemrite Ltd, 181 F.3d 435, 440 (3d Cir. 1999).  The parties, therefore, carry the burden of proving foreign law; where they do not do so, we "will ordinarily apply the forum's law." Id.

## III.  COGSA Governs This Transaction

Ferrostaal's initial argument on appeal is that, for two reasons, COGSA is not the controlling legal regime and that the higher liability limit of the Hamburg Rules should apply instead. It claims, first, that the Hamburg Rules are the law of Tunisia, requiring a conflict-of-laws analysis that ultimately results in the selection of those Rules.  Second, it claims that the Bills of

6

Lading are ambiguous and should be construed against the defendants—again, resulting in the selection of the Hamburg Rules.  We disagree.

## A.  COGSA, the Hamburg Rules, and the CONGENBILL

COGSA is the 1936 United States enactment of the Hague Rules, the first of two major international conventions to produce standardized shipping terms.  The Hague Rules, drafted in 1921 and adopted at an international conference in 1924,[4] have been enacted by most nations.  Section 4(4) of the original Hague Rules specified a liability limit of £100 instead of $500 and differed from COGSA § 4(5) in several other inconsequential ways.  A later protocol, the Hague-Visby Rules, adopted in 1968,[5] amended the Hague Rules to set an inflation-neutral liability limit.  The United States is not a signatory to the Hague-Visby Rules and has never enacted them.

The second major international set of shipping terms, the Hamburg Rules, was intended as a complete replacement for the Hague Rules.[6]  The Hamburg Rules have been enacted by comparatively few countries.  The United States has not enacted them; Tunisia has.  Article 6 of the Hamburg Rules includes the general limitation-of-liability rules of the Hague Rules, but with the inflation-neutral mechanism of the Hague-Visby Rules and a moderately higher limit:

> "The liability of the carrier for loss resulting
> from loss of or damage to goods according to the
> provisions of article 5 is limited to an amount

---

[4] Brussels Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, Aug. 25, 1924, 51 Stat. 233, 120 L.N.T.S. 155.

[5] Protocol to Amend the Hague Rules, Feb. 23, 1968, 1977 Gr. Brit. T.S. No. 83 (Cmnd. 6944) (entered into force June 23, 1977).

[6] United Nations Convention on the Carriage of Goods by Sea, Mar. 31, 1978, 17 I..L.M. 608.

equivalent to 835 units of account[7] per package or other shipping unit or 2.5 units of account per kilogramme of gross weight of the goods lost or damaged, whichever is the higher. . . . By agreement between the carrier and the shipper, limits of liability exceeding those provided for in paragraph 1 may be fixed."

App. 156-57a. Based on exchange rates as of January 15, 2003, the Hamburg Rules limited liability to $3.40 per kilogram or $1,135.89 per package, whichever was higher. This limit is substantially higher than the limit under the Hague Rules would be and, indeed, is high enough to cover all of Ferrostaal's alleged losses.

Shippers, carriers, and shipowners often attempt to specify the terms that will govern their contracts. Clause 24 of the Charter Party provided, in part:

"It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in [COGSA]. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:
U.S.A. Clause Paramount
This bill of lading shall have effect subject to [COGSA], which shall be deemed to be incorporated herein, and nothing contained herein shall be deemed a surrender of the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act."

---

[7] The Hamburg Rules use as their unit of account the Special Drawing Right, whose value is defined in terms of a basket of currencies.

App. 86a.  The Bills of Lading, however, did not contain such a clause.  Instead, they were issued on the popular standard CONGENBILL form.  The CONGENBILL included a "General Paramount Clause" that read:

> "(2) **General Paramount Clause**.  (a) The Hague Rules .  .  .  as enacted in the country of shipment, shall apply to this Bill of Lading.  When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.
> (b) *Trades where Hague-Visby Rules apply*.  In trades where [the Hague-Visby Rules] apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading."

App. 114a.

Article 10 of the original Hague Rules specified that they applied "to all bills of lading issued in any of the contracting States." App. 209a.  COGSA went further, making itself applicable to "[e]very bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade .  .  .  ." 46 U.S.C. app. § 1300.  Therefore, by its own terms, COGSA applies to this shipment.  The Bills of Lading state that the coils were to be discharged in the United States, and they were.  The Hamburg Rules are even broader.  They state that they apply whenever the port of loading or the port of discharge is in a contracting state (as in COGSA), whenever the bill of lading is issued in one (as in the Hague Rules), or when the bill of lading provides that they are applicable.

## B. Ferrostaal Has Not Established Tunisian Law

Ferrostaal argues that proper consideration of Tunisian law requires application of the Hamburg Rules instead of COGSA. Ferrostaal, however, has not demonstrated that the Hamburg Rules are the law of Tunisia. The only record evidence on the scope of Tunisian shipping law provided by Ferrostaal is the text of the Hamburg Rules and a list of nations, including Tunisia, that have enacted them into law. Ferrostaal did not provide expert testimony, the text of the actual enactment, Tunisian court decisions, excerpts from treatises, or any other authoritative sources. We cannot tell whether Tunisia enacted the Hamburg Rules with significant modifications, whether it has amended its laws since 1980, whether Tunisian law would provide the defendants with other relevant defenses, or even whether Tunisia would consider its own law applicable to this shipment. We do not have and cannot readily obtain the information we would need to make supportable findings about Tunisian law. See Fed.R.Civ. P. 44.1 advisory committee's note ("[T]he court is free to insist on a complete presentation [of foreign law] by counsel.").

Ferrostaal had the burden of establishing Tunisian law and showing that it differs from United States law. See Bel-Ray,181 F.3d at 440. It did not carry that burden. Under these circumstances, we assume that Tunisian law is the same as United States law, i.e., COGSA. In light of this assumption, we reject Ferrostaal's suggestion that because COGSA and the Hamburg Rules present a "false conflict" of laws, comity requires that we apply Tunisian law. The necessary predicate to this argument—knowing what Tunisian law says—has not been satisfied.

## C. The Bills of Lading Do Not Select the Hamburg Rules

Ferrostaal's argument that the Bills of Lading should be read to select the Hamburg Rules is also unconvincing. COGSA permits a carrier "to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and liabilities under this chapter, provided such surrender or increase shall be embodied in the bill of lading

10

issued to the shipper." 46 U.S.C. app. § 1305.  Thus, to the extent that the Bills of Lading "embody" a choice to adopt the Hamburg Rules, COGSA will not stand in the way of provisions more favorable to the shipper, such as the higher limit of liability.  See also id. § 1304(5); Ilva U.S.A. Inc. v. M/V Botic, No. 92-717, 1992 U.S. Dist LEXIS 16663, at *8 (E.D. Pa. Oct. 7, 1992) (selecting Hague-Visby Rules).

The CONGENBILL Bills of Lading used for this shipment, however, do not embody such a choice.  The General Paramount Clause begins by selecting the "Hague Rules .  .  .  as enacted in the country of shipment."  App. 114a.  Since Tunisia has not enacted the Hague Rules, this selection does not apply.  Where it does not, next in order of consideration is "the corresponding legislation of the country of destination."  Id.  That, of course, is COGSA—the United States legislation enacting the Hague Rules.  See St. Paul Fire and Marine Ins. Co. v. Thypin Steel Co., No.95 Civ. 4439, 1999 U.S. Dist LEXIS 3418, at *8 –11 (S.D.N.Y. Mar. 23, 1999), *vacated in part on other grounds*, 1999 U.S. Dist. LEXIS 12888, 1999 A.M.C. 2752 (S.D.N.Y. Aug. 23, 1999) (reaching similar result in interpreting CONGENBILL General Paramount Clause).

Ferrostaal argues that the mere fact that the Bills of Lading do not exclude the Hamburg Rules creates an ambiguity.  Ordinary principles of contract drafting impose no requirement that a choice of law clause explicitly exclude the law of jurisdictions other than the one selected.  See, e.g., RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 cmt. a (1971) ("[E]ven when the contract does not refer to any state, the forum may nevertheless be able to conclude from its provisions that the parties did wish to have the law of a particular state applied.").  The use of a provision selecting the Hague Rules is better understood as a decision not to select the Hamburg Rules than as a decision to make an ambiguous selection.  If, as Ferrostaal now suggests, the parties had forgotten about the Hamburg Rules, it could hardly have been their intent to select them.  Similarly, no ambiguity is created by referring to the Hague Rules rather than to a particular local enactment of them, such as COGSA.  See Indem. Ins. Co. of N. Am. v. Hanjin Shipping Co., 348 F.3d 628, 634 (7th Cir. 2003); Nippon Fire &

11

Marine Ins. Co. v. M.V. Tourcoing, 167 F.3d 99, 102 (2d Cir. 1999).

It makes no difference that the Hamburg Rules purport to apply to every shipment from a contracting state and that they purport to void any deviation from them. Even if it had been demonstrated that the Hamburg Rules were the law of Tunisia, their self-stated compulsory application would not be relevant to our interpretation of the terms of the Bills of Lading even if it might have been relevant in a Tunisian court. It is similarly irrelevant that the Hamburg Rules were first adopted after the CONGENBILL form was drafted. The contract between Tunisacier and TST (of which Ferrostaal is a beneficiary) was executed well after the adoption of the Hamburg Rules.

Finally, Ferrostaal's argument that the phrases "such enactment" and "shall apply" in the General Paramount Clause fail to exclude the Hamburg Rules is wholly without merit. "Such enactment," in the second sentence of the Clause, refers back to the "[Hague Rules] as enacted" in the first sentence. The Hamburg Rules explicitly require any contracting state to denounce the Hague Rules, so the "[Hague Rules] as enacted" cannot refer to the Hamburg Rules. Saying that one body of law "shall apply" logically excludes all others.

## IV. The Fair Opportunity Doctrine is Inconsistent with COGSA

Ferrostaal's other claim on appeal is that the fair opportunity doctrine precludes enforcement of the $500 limit. In general, in those Courts of Appeals that apply the doctrine, the carrier may not enforce the limit unless it presents a prima facie case that it offered the shipper a fair opportunity to avoid the limit by declaring a higher value.[8] The contents of that showing

---

[8] It is usually asserted that the shipper may then rebut this showing with evidence of its own to show that it was not offered such an opportunity. See, e.g., Kukje Hwajae Ins. Co. v. M/V Hyundai Liberty, 408 F.3d 1250, 1255 (9th Cir. 2005). We are not aware of any case in which the shipper successfully carried its

vary from Court to Court. The majority of Courts of Appeals require that the carrier provide the shipper with notice of the $500 limit and the declared value procedure. In the Ninth Circuit, for example, the carrier must include the text of COGSA § 4(5) or similar language in the bill of lading itself. See Kukje Hwajae Ins. Co. v. M/V Hyundai Liberty, 408 F.3d 1250, 1255 (9th Cir. 2005). Other Courts of Appeals focus on the carrier's willingness to offer a choice of different rates for different declared values. See, e.g., Brown & Root, Inc. v. M/V Peisander, 638 F.2d 415, 424 (5th Cir.1981) (finding fair opportunity where the carrier's published tariff offered a 5% *ad valorem* rate for excess declared value). Occasionally, the presence or absence of a space on the bill of lading in which a declared value could have been (but in fact was not) inserted is considered evidence of the presence or absence of a fair opportunity. See Nippon Fire & Marine Ins. v. M.V. Tourcoing, 167 F.3d 99, 101 (treating space for declaring excess value as evidence of notice and opportunity). In all, seven of our sister Courts of Appeals have adopted some version of the doctrine and it remains good law today in all seven.[9] It has also been the subject of mounting skepticism.[10] We have not, until

---

burden at the second step.

[9] See Nippon Fire & Marine Ins., 167 F.3d at 10 (2d Cir. 1999); Caterpillar Overseas, S.A. v. Marine Transp. Inc., 900 F.2d 714, 719 (4th Cir. 1990); Sabah Shipyard SDN BHD. v. M/V Harbel Tapper, 178 F.3d 400, 404 (5th Cir. 1999); Acwoo Int'l Steel Corp., v. Toko Kaiun Kaish, Ltd., 840 F.2d 1284, 1288-89 (6th Cir. 1988); Gamma-10 Plastics v. Am. President Lines, 32 F.3d 1244, 1251-54 (8th Cir. 1994); Kukje Hwajae Ins. Co., 408 F.3d at 1255 (9th Cir. 2005); Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co., 254 F.3d 987, 996 (11th Cir. 2001).

[10] See Senator Linie GMBH & Co. KG v. Sunway Line, Inc., 291 F.3d 14, 155 n.9 (2d Cir. 2002); Henley Drilling Co. v. William H. McGee, 36 F.3d 143, 146 n.5 (1st Cir. 1994); Carman Tool & Abrasives, Inc. v. Evergreen Lines, 871 F.2d 897, 899-900 (9th Cir. 1989); Alex Kozinski, *The Fourth Annual Frankel Lecture: The Relevance of Legal Scholarship to the*

now, had an opportunity to decide which version of the doctrine, if any, to apply.[11]

Under similar circumstances, the Court of Appeals for the First Circuit was able to resolve the case before it without ruling on the scope of the fair opportunity doctrine:

> "In light of our conclusion that the bill of lading met whatever 'fair opportunity' notice requirements are imposed by other circuits, we refrain from embracing the 'fair opportunity' doctrine itself, in any form. We take this course because the parties themselves have assumed, from the outset, that a COGSA-related 'fair opportunity' doctrine would apply. Thus, we leave for another day, and a proper adversarial setting, what we perceive to be a problematic question."

Henley, 36 F.3d at 146 n.5. The bill of lading at issue in Henley contained both a clause paramount explicitly selecting COGSA and a valuation clause limiting liability to $500 per package unless the shipper declared a higher value and paid a higher rate "as required by the applicable tariff." Id. at 146. Such provisions

_____

*Judiciary and Legal Community: Who Gives a Hoot About Legal Scholarship?*, 37 HOUS. L. REV. 295, 296-97 (2000); Michael F. Sturley, *The Fair Opportunity Requirement Under COGSA Section 4(5): A Case Study in the Misinterpretation of the Carriage of Goods by Sea Act (pts. 1&2)*, 19 J. MAR. L. & COMM. 1, 157 (1988).

[11] In our sole COGSA § 4(5) case, SPM Corp. v. M/V Ming Moon, 965 F.2d 1297 (3d Cir. 1992), we proceeded immediately to an analysis of the bill of lading to determine whether the parties intended to contract for a higher limit of liability. See id. at 1301-02. Finding an ambiguity created by the interaction of a clause incorporating COGSA and one stating, "Compensation shall not exceed US $2,-per kilogram," we held that they had. Id. In that context, it was unnecessary for us to reach the issue of the fair opportunity doctrine itself.

14

would have satisfied any extant version of the doctrine.

We do not have similar freedom here. The Bills of Lading would fail the fair opportunity test of at least one other Court of Appeals. See Pan Am. World Airways, Inc. v. Calif. Stevedore & Ballast Co., 559 F2d 1173 (9th Cir. 1977). The bill of lading in Pan Am. contained a clause paramount that incorporated COGSA by reference, but did not specifically note the opportunity to declare a higher value. The Ninth Circuit rejected the argument that "an experienced shipper should be deemed to have knowledge of an opportunity to secure an alternative freight rate, and higher carrier liability, by reason of his knowledge of COGSA, 46 U.S.C. § 1304(5), made applicable by a 'Paramount Clause' in the bill of lading, where such opportunity does not present itself on the face of the bill of lading." Id. at 1177. Here, where the Bills of Lading referred to COGSA only under the name of the "Hague Rules," and were silent on the option to declare a higher value, the Ninth Circuit's standard for fair opportunity would not be satisfied. We will, therefore, consider whether and to what extent the fair opportunity doctrine should be the law of this Circuit.

## A. Common Law Carrier Liability Doctrine Has Been Superseded by COGSA

Some courts have treated the fair opportunity doctrine as a matter of common law. See, e.g., Gen. Elec. Co. v. MV Nedlloyd, 817 F.2d 1022, 1028 (2d Cir. 1987). We, therefore, examine the history of carrier liability to determine whether common law precepts are applicable. We conclude that the enactment of COGSA rendered the question wholly statutory.

At common law in the late 19th century, a carrier could not limit its liability for damage caused by its own negligence. See, e.g., Bank of Ky. v. Adams Express Co., 93 U.S. 174, 181 (1876) (rail); Liverpool & Great W. Steam Co. v. Phoenix Ins. Co., 129 U.S. 397, 439 (1889) (sea). The Supreme Court recognized an exception to this principle in Hart v. Pennsylvania Railroad Co., 112 U.S. 331 (1884), in which it held that a shipper would be estopped from claiming that the goods were worth more than a valuation agreed upon in the bill of lading.

15

The Court reasoned that the carrier would have charged a higher rate if it had assumed liability against a greater valuation. "Agreed valuation" clauses, therefore, became a legal fiction by which a carrier could overcome the default rule that it would be liable for damage caused by its negligence. The logic was contractual. The carrier had the burden of overcoming the default of full liability by proving the contract; the shipper then had the burden of demonstrating why the contract should not control. See Frederick Leyland & Co. v. Hornblower, 256 F. 289, 291-92 (1st Cir. 1919) (citing cases).

In addition to pleading standard contractual defenses, the shipper could show that it had not actually had the option to declare a higher value. In The Kensington, 183 U.S. 263, 272-73 (1902), for example, the Supreme Court considered a 250-franc limit printed on a steamer ticket not signed by the plaintiff. It found that "no such right was allowed," id. at 273, in part because the terms under which the carrier allowed a higher value to be declared constituted "illegal conditions," id. at 276. Congress institutionalized this arrangement for railway carriage in several amendments to the Interstate Commerce Act: the Carmack Amendment, 34 Stat. 584 (1906), and the Cummins Amendment, 38 Stat. 1196, 1196-97 (1915), *amended by* 39 Stat. 441, 441-42 (1916). The amended Interstate Commerce Act enforced agreed valuations "declared in writing by the shipper or agreed upon in writing as the release value of the property" if and only if the Interstate Commerce Commission had authorized the carrier to set rates dependent on the value declared. See Am. Ry. Express Co. v. Lindenburg, 260 U.S. 584, 591-92 (1921). Although the Harter Act, 27 Stat. 445 (1893), prohibited provisions in bills of lading for oceanic carriage that purported to relieve a carrier from liability for its negligence, courts continued to enforce agreed valuation clauses in bills of lading. See, e.g., The Caledonier, 31 F.2d 257, 259 (2d Cir. 1929).

Section 4(5) of COGSA, enacted in 1936, changed this baseline in two ways. First, it made the first $500 of damage completely nondisclaimable. Second, it limited the carrier's liability to $500 "unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." 46 U.S.C. App. § 1304(5). Thus, COGSA

16

reversed the default rule for cases in which no value was declared; a "declared" value by which a shipper could demand full liability protection replaced an "agreed" value by which a carrier could exonerate itself. The $500 minimum is pro-shipper compensation for this change, part of the basic compromise between shippers and carriers at the heart of the Hague Rules and of COGSA. See 2A MICHAEL F. STURLEY, BENEDICT ON ADMIRALTY § 15 (2005).[12]

Section 4(5) now specifies the law of valuation clauses. It sets a default value of $500 for cases in which the bill of lading is silent. It negates any contractual attempts to reduce that liability limit, and provides two mechanisms—a valuation or an explicit contractual term—by which the parties can increase the liability limit. These provisions together provide for all possible cases. In so legislating, Congress has used its authority to displace the common law regime, leaving no room for the operation of common law doctrines on the liability of oceanic carriers for their negligence. Accordingly, pre-COGSA cases do not provide authority for the fair opportunity doctrine.

## B. Supreme Court Precedent Does Not Mandate the Fair Opportunity Doctrine

We are bound to apply decisions of the Supreme Court of the United States. We, therefore, turn to those decisions construing COGSA and those upon which the fair opportunity doctrine is claimed to rest. The phrase "fair opportunity" comes from a passage in a railroad case postdating COGSA, New York, New Haven, & Hartford Railroad Co. v. Nothnagle, 346 U.S. 128 (1953). Mrs. Nothnagle gave her suitcase to a redcap and never saw it again. The Supreme Court refused to enforce against her a liability limit declared only in the rate the railroad

---

[12] COGSA also followed a general policy of exempting the shipper from liability for damages resulting from certain causes—such as negligent navigation—while prohibiting the shipper from avoiding liability for damage stemming from others—such as a negligent failure to make the ship seaworthy. See 46 U.S.C. App. §§ 1303–1304.

had filed with the ICC.  The basis for the holding was that the railroad had failed to comply with the provision of the Interstate Commerce Act requiring a "value declared in writing by the shipper or agreed upon in writing," because the railroad had not given Mrs. Nothnagle so much as a baggage check.  Id. at 135. The Court continued:

> "But only by granting its customers *a fair opportunity to choose* between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained. Boston & Maine R. Co. v. Piper, 246 U.S. 439, 444-445 (1918); Union Pacific R. Co. v. Burke, 255 U.S. 317, 321-323 (1921); cf.  The Ansaldo San Giorgio I v. Rheinstrom Bros. Co., 294 U.S. 494, 497-498 (1935).  Binding respondent by a limitation which she had *no reasonable opportunity to discover* would effectively deprive her of the requisite choice.  *Ibid*.; cf. Watson Bros. Transp. Co. v. Feinberg Co., 193 F.2d 283, 286 (1951)."

Id. at 135-36 (emphasis added).

There is little resembling the modern fair opportunity doctrine in Nothnagle.  First, Nothnagle was a railway case; the Court gave no indication that the doctrine extended beyond railway carriage.[13]  Second, even in the context of railway carriage, the new phrases "fair opportunity to choose" and "reasonable opportunity to discover" were dicta.  The railroad had failed to comply with an express statutory condition; the discussion of "fair opportunity" is best read as explaining the rationale behind the Interstate Commerce Act's requirement of a writing.  Third, the decision upheld the rights of an individual

---

[13] Neither do the cases cited by the Court suggest that it does. The Ansaldo San Giorgio I is the only admiralty case of the four; it predates COGSA. Watson Brothers is the only post-COGSA case of the four; it is an Interstate Commerce Act case.

passenger who never saw a bill of lading, not a commercial shipper presented with one. The first sentence of the decision emphasizes that the "case concerns . . . a passenger's baggage loss." Id. at 129.

The Supreme Court has heard three COGSA cases colorably relevant to this case. All three of those cases concerned third-party issues. The first, United States v. Atlantic Mutual Insurance Co., 343 U.S. 236 (1952), involved a "both-to-blame" clause in the bill of lading. Both-to-blame clauses provide that when a ship collides with another and both vessels are negligent, the shipper is required to indemnify the carrier for liability to the other ship out of its own recovery from the other ship. The Court held such clauses invalid. Id. at 241. The Court did not regard the issue as one having to do with COGSA § 4(5); instead, it saw it as one of the interaction of common law strict liability for carriers and COGSA § 4(2), which exonerates carriers from liability to shippers arising out of their own negligent navigation (rather than negligent handling). In the absence of a specific command from COGSA allowing such clauses, the Court continued to apply the common law rule prohibiting carriers from contracting out of their own negligence. Id. at 239-40. Atlantic Mutual is inapposite here because COGSA § 4(5) specifies a rule governing liability limits, thereby displacing the common law rule.

Two later cases, Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297 (1959), and Norfolk Southern Ry. v. James N. Kirby, Pty Ltd., 543 U.S. 14 (2004), dealt with the liability of stevedores for damage to goods. Herd held that § 4(5) did not of its own force limit stevedores' liability, because COGSA § 4(5) protected only "the carrier [and] the ship." Herd, 359 U.S. at 301-02 (quoting 46 U.S.C. app. § 1304(5)). The Court appeared to assume that COGSA § 4(5) and "parallel provisions of the bill of lading" were independent routes to reach the $500 limit. It repeatedly referred to both, and to the intentions both of Congress and the parties to the bill of lading. After Herd, carriers have often inserted "Himalaya clauses" in their bills of lading to extend COGSA's $500 limit to apply to stevedores and other agents.

Kirby involved a pure, "simple question of contract interpretation," Kirby, 543 U.S. at 30, in construing two Himalaya clauses. It had this to say about § 4(5) (in its recitation of facts):

> "In negotiating the ICC bill, Kirby had the opportunity to declare the full value of the machinery and to have ICC assume liability for that value. Cf. New York, N. H. & H. R. Co. v. Nothnagle, 346 U.S. 128, 135, 97 L. Ed. 1500, 73 S. Ct. 986 (1953) (a carrier must provide a shipper with a fair opportunity to declare value). Instead, and as is common in the industry, see Sturley, *Carriage of Goods by Sea*, 31 J. Mar. L. & Com. 241, 244 (2000), Kirby accepted a contractual liability limitation for ICC below the machinery's true value, resulting, presumably, in lower shipping rates."

Id. at 19. While this passage refers to the fair opportunity doctrine, we do not read it to hold that the fair opportunity doctrine is binding law. The reference to "a fair opportunity" appears only in a parenthetical summarizing the holding of Nothnagle, which was not a COGSA case. The proposition for which it is cited is an uncontroversial statement of facts that assumes, without further inquiry, that a fair opportunity existed. The cited law review article is fiercely critical of the fair opportunity doctrine. We do not read a tangential reference in a Supreme Court decision as enacting, *sub silentio*, a doctrine as significant as the fair opportunity doctrine.

Although other Courts of Appeals have read Nothnagle somewhat differently than we do, they have not identified any further independent authority for the fair opportunity doctrine. The first decision applying the "fair opportunity" language to COGSA was Tessler Bros. (B.C.) v. Italpacific Line, 494 F.2d 438 (9th Cir. 1974).[14] There, a shipper sued a stevedore and,

_____

[14] Tessler Brothers is, after Nothnagle and Hart, the principal claimed source of authority for the fair opportunity

20

citing <u>Herd</u> and <u>Atlantic Mutual</u>, argued that Himalaya clauses were forbidden by COGSA.  The Ninth Circuit rejected that argument by distinguishing both-to-blame clauses from Himalaya clauses.

In a subsidiary argument, the shipper claimed that it was not offered a choice of rates and that, therefore, the $500 limit was not even available to the carrier, let alone to a stevedore.  The Ninth Circuit could have rejected this argument without reference to "fair opportunity," because COGSA does not purport to require a choice of rates.  Instead, it accepted the premise that the carrier must offer a choice of rates:

> "A significant restriction on a carrier's right to limit liability to an amount less than the actual loss sustained is that the carrier must give the shipper 'a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge. . . .' . . . . <u>Nothnagle</u>  . . . ; <u>Sommer Corp. v. Panama Canal Co.</u>, 475 F.2d 292, 298 (5th Cir. 1973), and cases cited therein."

---

doctrine. <u>Tessler Brothers</u> and its interpretation of <u>Nothnagle</u> are regularly also cited whenever <u>Nothnagle</u> itself is discussed. The fair opportunity doctrine in the Courts of Appeals has flowed from <u>Tessler Brothers</u>. <u>See</u> <u>Gen. Elec. Co. v. MV Nedlloyd</u>, 817 F.2d 1022, 1028-29 (2d Cir. 1987) (citing <u>Nothnagle</u>, <u>Hart</u>, and a Ninth Circuit case); <u>Cincinnati Milacron, Ltd.v. M/V/ American Legend</u>, 784 F.2d 1161 (4th Cir. 1986) at 1163-64 (citing <u>Nothnagle</u> and <u>Tessler Brothers</u>), at 1166 (Phillips, J., dissenting) (citing a Ninth Circuit case), *rev'd on other grounds en banc*, 804 F.2d 837 (4th Cir. 1986); <u>Brown & Root, Inc. v. M/V Peisander</u>, 648 F.2d 415, 420 n.11, 423-24 (5th Cir. 1981) (citing <u>Tessler Brothers</u>); <u>Acwoo Int'l Steel Corp. v. Toko Kaiun Kaish, Ltd.</u>, 840 F.2d 1284, 1288 (6th Cir. 1988) (citing <u>Cincinnati Milacron</u>); <u>Gamma-10 Plastics v. Am. President Lines</u>, 32 F.3d 1244, 1251-54 (8th Cir. 1994) (citing Ninth Circuit and Fourth Circuit cases).

Id. at 443-44.  The quoted passage from <u>Nothnagle</u> refers to the Interstate Commerce Act's validly-filed-tariff provision.  <u>Tessler Brothers</u> offers no further explanation why this feature of statutory railroad law should apply to COGSA.[15]  The decision then examines the bill of lading, which contained both a clause with "substantially the same provisions limiting liability as [COGSA] § 4(5)" and a clause paramount selecting COGSA:

> "[The shipper] contends that there is no evidence that the shipper was offered a choice of rates, one with the limitation and another without it.  The

---

[15] Neither does <u>Sommer</u>, cited in <u>Tessler Brothers</u>. <u>Sommer</u> concerned damage incurred after unloading, to which COGSA was not directly applicable.  <u>Sommer</u>, 475 F.2d at 295. Under the complex circumstances of the case, the shipper's failure to pay a $6.88 handling charge attributable to excess value, but not calculated by the carrier until months later, did not allow the carrier to claim the benefit of the $500 contractual liability limit.

The fair opportunity doctrine arises only in a brief discussion of issues the decision does not affect.  It cites <u>Nothnagle</u>, <u>id.</u> at 298, but a statement two sentences later is flatly inconsistent with the notice-oriented versions of the doctrine: "Nor does [the Court's conclusion] remotely suggest that Canal Company either waived the various provisions or was estopped to assert them merely because shipper-consignee was unaware of them." <u>Id.</u>

The other "cases cited therein" (all from the Courts of Appeals) on the fair opportunity issue consist of two cases under the Interstate Commerce Act, <u>Sorensen-Christian Industries, Inc. v. Railway Express Agency, Inc</u>., 434 F.2d 867, 868-69 (4th Cir. 1970), and <u>Chandler v. Aero Mayflower Transit Co.</u>, 374 F.2d 129, 132 n.2 (4th Cir. 1967), and two cases in which the carrier was held to have breached an express promise to provide insurance, <u>Hamilton v. Stillwell Van & Storage Co.</u>, 343 F.2d 453, 454 (3d Cir. 1965) (landborne carriage), and <u>Rhoades, Inc. v. United Air Lines, Inc.</u>, 340 F.2d 481, 486 (3d Cir. 1965) (airborne carriage).  None of these cases found a fair opportunity doctrine in COGSA.

22

provisions in the bill of lading and COGSA are prima facie evidence of the opportunity to avoid the limitation, however, and it is [the shipper's] burden to prove that such an opportunity did not in fact exist. Petition of Istbrandtsen Co., 201 F.2d 281, 285 (2d Cir. 1953). [The shipper] did not carry this burden."

Id. The prima facie burden of proof on the carrier is borrowed from Petition of Istbrandtsen, which does not analyze COGSA § 4(5) itself and cites as authority only Hart and other cases predating COGSA.

A later Ninth Circuit case, Pan American World Airways, Inc. v. California Stevedore & Ballast Co., 559 F.2d 1173, 1177 (9th Cir. 1977), appears to be the source of the understanding that COGSA requires not merely that the carrier be willing to accept a higher declared valuation (possibly by charging a higher rate) but must also give the shipper specific notice of the $500 limit and the declared value option:

"Rather, we reject appellant's argument that an experienced shipper should be deemed to have knowledge of an opportunity to secure an alternative freight rate, and higher carrier liability, by reason of his knowledge of COGSA, 46 U.S.C. § 1304(5), made applicable by a 'Paramount Clause' in the bill of lading, where such opportunity does not present itself on the face of the bill of lading. The bill of lading is usually a boilerplate form drafted by the carrier, and presented for acceptance as a matter of routine business practice to a relatively low-level shipper employee. We feel that imputing such knowledge of COGSA applicability and provisions to such an employee is an assumption that may well go beyond the bounds of commercial realism."

Id. Notably absent from this ringing vindication of the right of shippers to avoid standard terms in contracts entered into by their employees acting within the routine scope of their

employment is any citation to authority, relevant or otherwise.

In summary, our survey of precedent reveals no basis to conclude that the carrier must offer a choice of rates or provide the shipper with notice of the $500 limit. Nor can we find a basis for placing the initial burden of proof on the carrier.

## C. The Fair Opportunity Doctrine is Not Consistent with the Text of COGSA § 4(5)

Because we have determined that the fair opportunity doctrine is not compelled by precedent, we must make our own determination of whether the text of COGSA § 4(5) is susceptible of a reading in which the fair opportunity doctrine appears:

> "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.
> By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: Provided, That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.
> Neither the carrier nor the ship shall be responsible in any event for loss or damage to or in connection with the transportation of the goods if the nature or value thereof has been knowingly and fraudulently misstated by the shipper in the bill of

24

lading."

46 U.S.C. app. § 1304(5).

This passage cannot be read to permit, much less to require, the fair opportunity doctrine. Its first sentence unambiguously places on the *shipper* the responsibility to declare a higher value for its goods if it wishes to avoid the $500 limit: "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to . . . goods in an amount exceeding $500 per package . . . unless the nature and value of such goods have been declared *by the shipper* before shipment and inserted in the bill of lading." (emphasis added). This language does not mention notice or the format of a bill of lading, and does not refer to higher rates for additional declared value.

The enforceability of the $500 limit is made conditional only upon the shipper's failure to declare a higher value. "By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed . . . ." This provision emphasizes that the "agreement" of the shipper and carrier is required to vary the limitation from $500. Similarly, because a bill of lading is issued by the carrier, no declaration of value could be "inserted" in it without the carrier's consent, yet the fair opportunity doctrine requires the carrier to show, in effect, that it would consent to any declaration made by the shipper. It would pervert the meaning of these phrases to read them as requiring the carrier to take affirmative steps to enforce the $500 limitation. We find it more natural to read them at face value. The carrier will not be liable in excess of $500 per package unless it has acknowledged a higher value or agreed to a higher limit.

We are also unable to locate in § 4(5) any basis for placing an initial burden of proof of a fair opportunity on the carrier. Before COGSA, when the carrier could rely only on the bill of lading, it was appropriate to require the carrier to bear the initial burden of showing a fair opportunity. The carrier was by default liable for all damage caused by its negligence and could

25

reduce its liability only by showing a valid agreed valuation clause. But COGSA, as governing law, relieves the carrier from liability beyond $500; the carrier, by producing a bill of lading, has easily satisfied its burden of showing that the case falls within COGSA. From then on, any burden (of production or persuasion) should fall on the shipper, whose task is to show that "the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." 46 U.S.C. App. 1304(5). The ultimate issue is not the opportunity to declare but the declaration itself. Section 4(5) is not "evidence of the opportunity to avoid the limitation," as <u>Tessler Brothers.</u>, 494 F.2d at 443, would have it. Section 4(5) *is* the limitation. It is therefore incorrect to speak of the carrier presenting "prima facie evidence" of the opportunity, because COGSA places no burden of production on the carrier in the first place.

Finally, we observe that Congress included an explicit notice provision in an analogous context in the Interstate Commerce Act. COGSA should not be read as though it contained an implied notice provision.

### D. The Fair Opportunity Doctrine is Not Consistent with the Policies of COGSA § 4(5)

We find support for our conclusion that a fair opportunity doctrine does not come within COGSA § 4(5) from the policies embodied in that section. First, COGSA § 4(5) does not require that the shipper have paid a higher rate to enjoy the benefits of having declared a higher value, thus implying that the fair opportunity doctrine's occasional concern with a choice of rates is misplaced. Second, the fair opportunity doctrine's solicitude for the unsophisticated shipper is misplaced in commercial legislation such as COGSA. The typical disclosure requirement is intended to warn of a departure from a legal default, protects unsophisticated parties, and applies where the parties have unequal bargaining power. COGSA's $500 limit is itself the default, most shippers COGSA reaches are commercially

sophisticated and used to dealing with COGSA,[16] and the market for oceanic carriage of goods is competitive, giving shippers substantial freedom to choose among hundreds of international shipping concerns. Under the scheme of COGSA § 4(5), the shipper already has an effective remedy for not being allowed to declare a higher value: it can take its business elsewhere.

Third, COGSA anticipates that shippers will often acquire marine insurance through third parties. The typical policy of marine insurance covers many risks for which the carrier would not be liable under COGSA, such as damage arising out of negligent navigation, deviations to save life or property, or non-negligent handling of the cargo. See GRANT GILMORE &. CHARLES L. BLACK, THE LAW OF ADMIRALTY §§ 2-9, 2-10 (2D ED. 1975); 46 U.S.C. app. § 1304(2)-(4). Insurance through third-party maritime insurers is usually cheaper and more convenient than insurance by the carrier and prudent shippers will insure their cargo regardless of the allocation of liability for negligent damage.[17] The fair opportunity doctrine, in seeking to vindicate the rights of shippers, confers a windfall on subrogated insurers.

Fourth, COGSA is the enactment by the United States of an international convention adopted to create international uniformity and simplicity. Its text almost exactly tracks the text of the Hague Rules. One significant goal of the Hague Rules was to free bills of lading from highly particularized statements of rights under particular national laws. See Michael F. Sturley, *The Fair Opportunity Requirement Under COGSA Section 4(5): A Case Study in the Misinterpretation of the Carriage of Goods by Sea Act, Part II*, 19 J. MAR. L. & COMMERCE 157, 175 (1988).

---

[16] Ferrostaal is no exception. See, e.g., Ferrostaal, Inc. v. M/V Sea Baisen, 2005 AMC 482 (S.D.N.Y. 2004); Ferrostaal, Inc. v. M/V Tupungato, 2004 AMC 2498, (S.D.N.Y. 2004); Ferrostaal Inc. v. M/V Yvonne, 10 F. Supp. 2d 610 (E.D. La. 1998).

[17] We note that Ferrostaal chose to insure the cargo at issue in this case.

The liability limit was a compromise between carrying and shipping interests, id. at 184-85, intended to be applied uniformly around the world. The drafters of the Hague Rules would not have anticipated the fair opportunity doctrine. Id. at 174-77. Even other common law countries do not have a fair opportunity doctrine; Canada has explicitly rejected one. Id. at 166-69. Shipping was and is a highly international business, as the diverse nationality of the parties in this case suggests. The fair opportunity doctrine imposes extra costs on shippers and carriers who deal with the United States market, particularly when it strikes down terms in bills of lading drafted to avoid citing a multitude of national laws.

We conclude that the fair opportunity doctrine does not comport with the principles of COGSA § 4(5) any more than it comports with the text of that section.

## V. Conclusion

The fair opportunity doctrine is not to be found in the text of COGSA. Whatever the merits of the common law regime imposing liability on the carrier by default, COGSA reversed that default. Looking for a "fair opportunity" means ignoring COGSA in favor of the very regime COGSA overrode. The statute is not neutral as between carriers and shippers on this point; the burden is on the shipper to declare a greater value. Nor is the fair opportunity doctrine to be found in caselaw that binds us.

We hold that the fair opportunity doctrine has no place in the application of COGSA; we apply COGSA § 4(5) as written. Ordinarily, the $500 limit is available to the carrier. The shipper bears the burden of establishing that it has "declared" "the nature and value of such goods . . . and inserted [the declaration] in the bill of lading." 46 U.S.C. app. § 1304(5). The carrier remains free to present evidence that the declared value overstated the true value, but the shipper is estopped from claiming that it has suffered a loss in excess of the value it declared. See id.

We agree with the District Court that COGSA governs

28

the transaction at issue here.  A straightforward application of COGSA's text, therefore, resolves this case.  Ferrostaal did not declare a higher value and have that value inserted in the Bills of Lading.  As a result, its recovery is limited to $500 per package.  It is unnecessary to reach the question, answered by the District Court in the affirmative, of whether Ferrostaal had a "fair opportunity" on the facts of this case.

We will affirm the judgment of the District Court.